616 F.2d 641
 Fed. Sec. L. Rep. P 97,268
Michael J. HEALEY, Jr., Individually and for himself and
derivatively on behalf of all shareholders of
Catalyst Regeneration Services, Inc.,
for the benefit of Catalyst
Regeneration Services, Inc.
v.
CATALYST RECOVERY OF PENNSYLVANIA, INC., Catalyst Recovery
of Louisiana, Inc., Catalyst Recovery, Inc., and Dennis J.
Shaughnessy and Lawrence P. Naylor, III and P. Kenrick Maher
and Wilbert H. Sirota and Joann Benedict and Carmen L.
Porter and V. L. Schultz and Robert Levi and Mercantile Safe
Deposit & Trust Co.,
Catalyst Recovery of Pennsylvania, Inc., Catalyst Recovery
of Louisiana, Inc., Catalyst Recovery, Inc., Dennis J.
Shaughnessy, Lawrence P. Naylor, III, P. K. Maher, Wilbert
H. Sirota, and Robert Levi, Appellants.
 No. 79-1370.
 United States Court of Appeals,
Third Circuit.
 Argued Nov. 13, 1979.
Decided Jan. 29, 1980.
 
 Gilbert J. Helwig (argued), Joseph F. McDonough, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., H. Vernon Eney (argued), Venable, Baetjer & Howard, Baltimore, Md., for appellants.
 Albert G. Feczko (argued), Feczko & Seymour, Pittsburgh, Pa., Kenneth R. Long (argued), Pittsburgh, Pa., for appellee.
 Before SEITZ, Chief Judge, ALDISERT, Circuit Judge, and HUYETT, District Judge.*
 OPINION OF THE COURT
 SEITZ, Chief Judge.
 
 
 1
 Five individual and three corporate defendants appeal from a judgment entered against them on a jury verdict awarding the plaintiff damages for violation of § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and rule 10b-5, 17 C.F.R. § 240.10b-5.
 
 I. Factual Background
 
 2
 In the spring of 1972, the plaintiff became a 20% shareholder and president of Catalyst Regeneration Services, Inc. (CRS), a Texas corporation. CRS set up its only plant in Pennsylvania and began regenerating oil refining catalysts (a process by which the catalyst is cleaned for reuse).
 
 
 3
 In early 1975, defendant P. K. Maher, a research chemist in the field of petroleum catalysts, decided to acquire an existing company and enter the regeneration market. Maher began contacting people in the Baltimore area in his search for investors for his plan. The first investor to join him was defendant Robert H. Levi, vice chairman of the board of directors at Mercantile Safe Deposit & Trust Co. (Mercantile). Levi then introduced Maher to defendant Lawrence P. Naylor, III, who also invested.
 
 
 4
 At about the same time, Maher began soliciting legal and business help in setting up and running his company, which was incorporated in Maryland and became known as SCR, Inc. (SCR).[1] He persuaded defendant Dennis J. Shaughnessy, a vice president at Mercantile, and defendant Wilbert H. Sirota, a partner in a Baltimore law firm, to assist him with planning the acquisition of an existing company. Eventually, Maher, Naylor, Shaughnessy, and Sirota became officers and/or directors of SCR and its subsidiary companies, all of which were made defendants.
 
 
 5
 In July of 1975, after studying the existing regeneration companies, Maher decided to purchase CRS, the plaintiff's company. Shaughnessy began negotiating a stock purchase with the major shareholder of CRS. The negotiations over the price to be paid for the stock continued for the next four months. In November of 1975, all the shareholders of CRS other than the plaintiff agreed in principle to sell their 80% at a price of $5.25 per share. The plaintiff knew of this agreement and the previous offers and counteroffers but did not join in the agreement.
 
 
 6
 Next, in December, Maher, Naylor, and Sirota discussed with the plaintiff on behalf of SCR a possible purchase from him of the remaining 20% of the CRS stock. Plaintiff testified that he requested certain information at these December meetings that he never received. This information included long and short range plans for SCR, the identity of SCR board members and shareholders, and other similar information. The defendants admit that some of the information was never given to the plaintiff. In the course of the negotiations, the plaintiff submitted a proposed purchase option and a request for an employment contract. Sirota replied by letter on December 24 that SCR would only buy the plaintiff's shares on the same terms as the other 80%.
 
 
 7
 In late February of 1976, the plaintiff travelled to Baltimore to meet with Maher to "see if I (could) get more information out of him." Meeting with both Maher and Sirota, he renewed his request for a five-year plan for SCR and asked whether selling expenses for other CRS shareholders would be paid. The defendants admit he was not given the information relating to either request.
 
 
 8
 On March 2, 1976, SCR purchased 80% of the CRS stock pursuant to the agreement the previous November. On March 15, a new board of directors for CRS was elected without the plaintiff being reelected. For the rest of March, the plaintiff and Maher continued discussions but could not agree on a price.
 
 
 9
 In early April, a decision was made by SCR to form a new company and effect a merger between it and CRS. Accordingly, Catalyst Recovery of Pennsylvania, Inc. (CRPa) was incorporated in Maryland as a wholly owned subsidiary of SCR. SCR then transferred its own preferred shares to CRPa.
 
 
 10
 On April 12, 1976, Maher gave the plaintiff a copy of the proposed merger between CRS and CRPa along with a notice of a CRS shareholders meeting to be held on May 3 to vote to approve the merger, a description of the SCR preferred stock, and an SCR balance sheet. Under the merger proposal, if the CRS shareholders voted to approve (which was inevitable under Texas law given SCR's 80% ownership of CRS), then the CRS shareholders would transfer their CRS shares to CRPa in return for the SCR preferred.
 
 
 11
 On April 27, the plaintiff's attorney sent a letter to Sirota requesting six categories of information,[2] objecting to the merger, and threatening legal action. On April 28, the plaintiff sent a letter to Maher objecting to the merger and expressing his "intention to exercise his right to dissent."
 
 
 12
 On April 29, SCR did two things. First, Donovan M. Hamm, Jr., a member of Sirota's law firm, called one of the plaintiff's lawyers and stated a willingness to provide information and said the merger still would go through. Second, the same day Hamm sent a letter to the plaintiff's lawyer. Among other things, it answered some of the questions in the plaintiff's attorney's April 27 letter and confirmed the telephone offer to permit inspection of SCR documents and records by the plaintiff.[3]
 
 
 13
 On May 3, 1976, SCR voted its 80% of the CRS stock to approve the CRS-CRPa merger. On May 11, the plaintiff's attorney again wrote a letter to Sirota asking for a chance to inspect the information as had been suggested in Hamm's April 29 letter. No such inspection ever occurred. See note 3 supra.
 
 
 14
 The merger became effective June 30, 1976, and the plaintiff filed this suit seeking an injunction and damages under § 10(b) and rule 10b-5. The plaintiff also filed an appraisal petition in Texas court in September 1976, which was dismissed without prejudice in August 1977. After a lengthy jury trial in federal court, the jury found for the plaintiff for $189,400 plus prejudgment interest. This appeal followed.
 
 II. Existence of a Cause of Action
 
 15
 The major contention of the defendants concerns a recurring problem of recent years: the role of rule 10b-5 in the context of mergers effected under state law. At trial, the plaintiff argued that if he had been given the information he requested, he would have tried to enjoin the merger in state court.[4] He relied on Goldberg v. Meridor, 567 F.2d 209 (2d Cir. 1977), cert. denied, 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978), which held that such a theory states a basis for a cause of action under rule 10b-5. The defendants argue that under Goldberg, the plaintiff must prove that he would have obtained the injunction had he been given the information in question. Although Goldberg did not expressly consider this issue, the defendants' position was adopted in Kidwell ex rel. Penfold v. Meikle, 597 F.2d 1273 (9th Cir. 1979).
 
 
 16
 Initially, we must determine whether this circuit should adopt the reasoning of Goldberg. Some have argued that Goldberg is inconsistent with the Supreme Court's opinion in Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). E. g., Note, Goldberg v. Meridor : The Second Circuit's Resurrection of Rule 10b-5 Liability for Breaches of Corporate Fiduciary Duties to Minority Shareholders, 64 Va.L.Rev. 765 (1978).
 
 
 17
 In Santa Fe, minority shareholders brought suit under rule 10b-5 challenging the fairness of the terms of a short form merger effectuated under Delaware law. The Court noted: "(T)he complaint failed to allege a material misrepresentation or material failure to disclose. The finding of the District Court . . . was that there was no 'omission' or 'misstatement' . . . ." 430 U.S. at 474, 97 S.Ct. at 1301. The Court therefore held that because the language of both § 10(b) and rule 10b-5 required some kind of improper flow of information, whether deception, misrepresentation, manipulation, or nondisclosure, the complaint failed to state a cause of action. Id. at 474-77, 97 S.Ct. 1292.
 
 
 18
 Although the statutory language in Santa Fe was " 'sufficiently clear in its context' to be dispositive here," id. at 477, 97 S.Ct. at 1303 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 201, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)), the Court in Part IV of its opinion went on to examine other reasons for its refusal to find a cause of action under rule 10b-5. Noting that the essence of the complaint was a breach of fiduciary duty by the majority shareholders, the Court characterized this as "corporate conduct traditionally left to state regulation." Id. at 478, 97 S.Ct. at 1304. The Court concluded: "Absent a clear indication of congressional intent, we are reluctant to federalize the substantial portion of the law of corporations that deals with transactions in securities, particularly where established state policies of corporate regulation would be overridden." Id. at 479, 97 S.Ct. at 1304.
 
 
 19
 In Santa Fe, the minority's only possible state law remedy was appraisal. See id. at 474 n.14, 97 S.Ct. 1292. The United States Court of Appeals for the Second Circuit distinguished the case in part on this ground in Goldberg v. Meridor, 567 F.2d 209 (2d Cir. 1977), cert. denied, 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978). In that case, under New York law the plaintiffs could seek an injunction against the merger in addition to their appraisal rights. Thus the information in the case was material to a reasonable investor because he could have used it to attempt to obtain an injunction. See id. at 218-19.
 
 
 20
 It is important to note at the outset the difference between Goldberg and Santa Fe. The mere existence of a state injunctive remedy would be insufficient, by itself, to distinguish Santa Fe. The crucial difference is whether there was misrepresentation or omission in the flow of information between the majority and minority shareholders. In Santa Fe, the Supreme Court expressly noted that there had been no misinformation connected with the merger. By contrast, in Goldberg, the plaintiffs claimed that a parent corporation had either not disclosed or misleadingly disclosed information concerning its sale of the overvalued assets of its controlled subsidiary, some of the shares of which were held by the public. See 567 F.2d at 211-13, 221.
 
 
 21
 We believe that this distinction concerning the flow of information between the majority and minority shareholders is persuasive. There is a strong federal interest, evidenced by the entire field of federal securities regulation, in ensuring a proper flow of information between the parties to a securities transaction. The Supreme Court has sanctioned a private cause of action under rule 10b-5 on behalf of sellers to enforce that federal interest. See Santa Fe, supra, 430 U.S. at 477, 97 S.Ct. 1292, citing Superintendent of Insurance v. Bankers Life & Casualty Co., 404 U.S. 6, 13 n.9, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). All that Goldberg holds is that if some misrepresentation or omission by the defendant prevents the plaintiff from stopping the merger through a state injunction, then there is a cause of action under rule 10b-5. Because this result flows from misinformation that harms the plaintiff, it is precisely the type of situation to which rule 10b-5 is addressed.
 
 
 22
 Nor do we perceive an inconsistency between this result and Part IV of Santa Fe. Part IV should not be read out of context. What was objectionable in Santa Fe was use of rule 10b-5 by the federal courts to override traditional areas of state law "(a)bsent a clear indication of congressional intent." 430 U.S. at 479, 97 S.Ct. at 1304. Thus the problem in Santa Fe was not merely federal judicial intrusion into areas of state law, but rather federal judicial invasion of areas of state law without explicit federal statutory authority.
 
 
 23
 Here, by contrast, the plaintiff alleges that the defendants engaged in conduct expressly forbidden by the statute and the rule: an omission of certain information claimed to be material. That the harm to the plaintiff from the omission was deprivation of a state remedy in no sense diminishes the federal interest in preventing the omission and thereby ensuring full disclosure of all material information in securities transactions. Indeed, deprivation of state rights and remedies often forms the basis for federal claims. See, e. g., Hart & Wechsler's The Federal Courts and the Federal System 500-06 (2d ed. 1973).
 
 
 24
 Moreover, the federal courts have a duty under the supremacy clause of the Constitution to ensure that federal interests are vindicated. The Supreme Court has permitted use of the securities laws in the merger context where there has been misinformation that violates a specific federal provision. See, e. g., TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) (proxy rules). Thus we do not feel that Santa Fe can be read to force us to stay our hand from remedying the harm that flows from the very type of conduct to which specific federal statutory and regulatory provisions are addressed.
 
 
 25
 Accordingly, we hold that where a misrepresentation or omission of material information deprives a proper plaintiff minority shareholder of an opportunity under state law to enjoin a merger, there is a cause of action under rule 10b-5.
 
 III. Elements of a Cause of Action
 A. Materiality
 
 26
 Having determined that the plaintiff has a cause of action, we now consider the defendants' contentions that certain required elements of the 10b-5 cause of action are absent here. Preliminarily we note that the defendants make no contention that the plaintiff does not satisfy the purchaser-seller rule of Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).
 
 
 27
 The defendants argue that a plaintiff must make some type of showing on the question of whether he would have actually been granted the injunction had he been given the information in question. The United States Court of Appeals for the Ninth Circuit in Kidwell ex rel. Penfold v. Meikle, 597 F.2d 1273 (9th Cir. 1979), adopted this rule on the theory that to hold otherwise would be inconsistent with Santa Fe's concern over federal judicial encroachment on areas of law traditionally left to the states. See id. at 1294.
 
 
 28
 We feel it is better to view this question as an aspect of the materiality requirement. As already noted, once a sufficient disruption in the flow of information is alleged, as in Goldberg and here, the concerns expressed in Part IV of Santa Fe are not present. Therefore, Santa Fe is not particularly helpful in deciding whether there must be proof that the plaintiff had some chance of success in his injunctive suit. The theory of Goldberg is that the plaintiff wanted the information to make a decision whether to apply for a state injunction. Accordingly, we think a doctrine that is geared to the plaintiff's decisionmaking process is more suitable for analyzing the question the defendants have raised here.
 
 
 29
 Under rule 10b-5, misinformation by misrepresentation or omission is not by itself sufficient; the information in question must be material. The Supreme Court has defined materiality as: "a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder." TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). Because this test is geared to the plaintiff's decisionmaking process, we think it is the relevant framework for analyzing the present question.
 
 
 30
 Applying this standard to the present case, the question is what information would be deemed to be material by the reasonable investor who contemplates seeking an injunction against a merger. Seen as a question of materiality, the issue of the plaintiff's ability to secure an injunction is easily resolved. Unless there is a reasonable probability that a shareholder could have used the information to obtain an injunction, then the information would not be important to the decisionmaking process of a reasonable investor. We therefore hold that in a case such as this the plaintiff must demonstrate that at the time of the misrepresentation or omission, there was a reasonable probability of ultimate success in securing an injunction had there been no misrepresentation or omission. Although Meikle speaks in terms of actual success, we frame the test in terms of a reasonable probability for two reasons. First, we believe absolute certainty to be both an impossible goal as well as an impracticable standard for a jury to implement. Second, in most cases the state remedy will be a preliminary injunction, which looks to the likelihood of ultimate success.
 
 
 31
 It is important to stress here the relationship of the information to the injunction. As already noted, the mere existence of an injunctive remedy is not enough; the information must be of a type that if the plaintiff had the information not supplied, he could use it to seek an injunction. For example, in a case of omitted information, the question is whether, if the plaintiff had received the information, it would have been significant to the determination of the reasonable probability of ultimate success.
 
 
 32
 Applying these principles to the facts here, we find that a remand is necessary. One can enjoin a merger for any of several reasons: fraud, illegality, ultra vires act, or unfairness. See generally W. Cary, Cases and Materials on Corporations 1707-12 (4th ed. 1969). It is unclear which, if any, of these doctrines would apply under Texas law. See, e. g., Texas Bus.Corp.Act Ann. art. 5.16.E(5) (Vernon Cum. Supp.1978-1979); Governing Board v. Pannill, 561 S.W.2d 517 (Tex.Civ.App.1977); Inter-Continental Corp. v. Moody, 411 S.W.2d 578 (Tex.Civ.App.1966); Farnsworth v. Massey, 365 S.W.2d 1 (Tex.1963).
 
 
 33
 In any event, we cannot decide the question here because the district court did not address this issue and it has not been fully briefed in this court. Therefore, we remand to the district court to consider in the first instance whether there was sufficient evidence to create a jury issue on the question of the plaintiff's reasonable probability of ultimate success under Texas law. This requires a two-step inquiry. First, the court should determine what information the jury could reasonably believe was withheld. Second, it should determine whether any of that information could have been used to obtain a Texas injunction. If there was as a matter of law no reasonable probability of ultimate success, the information is not material.
 
 
 34
 Because there may be a new trial, we feel it is necessary to give some guidance as to the submission of the question to the jury. The problem is in some respects similar to cases involving legal malpractice or the law of a foreign country, where the question of what the law is can be either the subject of judicial notice or an issue for the jury. We leave to the district court in the first instance whether it will determine what Texas law is or leave that for the jury. In either event, there must be an appropriate instruction covering the relevant state law. Next, regardless of how the legal standard is submitted to the jury, the court should instruct the jury that it should test the facts against that legal standard and decide whether there was a reasonable probability of ultimate success. This instruction should be given in connection with the charge on materiality.
 
 
 35
 In sum, we hold that where a minority shareholder in a merger alleges a material misrepresentation or omission by the defendant in connection with the merger that deprived him of a state law injunctive remedy, a cause of action is asserted under rule 10b-5. For such information to be material, the plaintiff bears the burden of proving that had he received the correct information he would have had a reasonable probability of ultimate success in the state injunctive action. We remand to the district court to determine whether there was sufficient evidence to create a jury issue on materiality.
 
 B. Causation
 
 36
 Because of the possibility of a new trial, we will consider the remaining contentions of the defendants. The defendants claim that the district court erred by failing to give a special interrogatory on causation. We are not persuaded by this argument.
 
 
 37
 The district court has wide latitude in deciding which issues should be covered by special interrogatories. Its action will only be overturned for an abuse of discretion. Here, the district court covered causation in its charge[5] and felt a special interrogatory would not be necessary. Generally this is not an abuse of discretion. See Kornicki v. Calmar Steamship Corp., 460 F.2d 1134, 1139 (3d Cir. 1972).
 
 
 38
 The defendants try to overcome this rule by labelling the question of whether the plaintiff could have gotten an injunction as a causation issue. They argue that because this was the crucial element of the plaintiff's case, it was an abuse of discretion not to have a special interrogatory covering it. This argument is somewhat disingenuous given that a portion of the defendants' brief treats this as a question of materiality. In any event, we feel that any problems of causation are adequately disposed of by applying objective materiality criteria. See Mills v. Electric Auto-Lite Co., 396 U.S. 375, 384-85, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). Assuming a charge in accordance with the previous section were given, because we view the question as one of materiality and because special interrogatory 1 required a finding as to materiality, we reject the defendants' argument.
 
 C. Scienter
 1.
 
 39
 The defendants contend that the district court improperly charged the jury as to the defendants' scienter. To prevail on a rule 10b-5 claim, the plaintiff must prove scienter. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). In this circuit, a showing of recklessness satisfies the scienter requirement. See Coleco Industries, Inc. v. Berman, 567 F.2d 569 (3d Cir. 1977) (per curiam), cert. denied, 439 U.S. 830, 99 S.Ct. 106, 58 L.Ed.2d 124 (1978).
 
 
 40
 In Coleco, we left open the definition of recklessness. See id. at 574. At trial, the defendants asked the district court to use the standard set forth in Sundstrand Corp. v. Sun Chemical Corp., 553 F.2d 1033 (7th Cir.), cert. denied, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977), in defining recklessness for the jury. Sundstrand defines "recklessness" as "an extreme departure from the standards of ordinary care, . . . which presents a danger of misleading . . . that is either known to the defendant or is so obvious that the actor must have been aware of it." Id. at 1045 (citation omitted).
 
 
 41
 The district court rejected this language, though expressly requested by the defendants, and gave the following charge:
 
 
 42
 An innocent error or a mistake of judgment or even a negligent error are not enough to establish (scienter). An act is done recklessly if it is done with indifference to the consequences.
 
 
 43
 In McLean v. Alexander, 599 F.2d 1190 (3d Cir. 1979), we adopted the Sundstrand charge as the law of this circuit. Id. at 1197. We reasoned that Sundstrand was a proper reading of Ernst & Ernst because it defined recklessness as being relatively close to intentional conduct. Accordingly, we hold that the district court's use of the phrase "indifference to the consequences" instead of the language requested by the defendants does not satisfy McLean.
 
 2.
 
 44
 Maher, Naylor, Shaughnessy, and Sirota also contend that there was insufficient evidence of their scienter as a matter of law. In the face of the jury's verdict, the defendants would be entitled to judgment n. o. v. only if we could say that as a matter of law "the record is deficient of that 'minimum quantum of evidence from which a jury might reasonably afford relief.' " Fireman's Fund Insurance Co. v. Videfreeze Corp., 540 F.2d 1171, 1178 (3d Cir. 1976) (citation omitted), cert. denied, 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977).
 
 
 45
 Here there was evidence that these four defendants were aware of the plaintiff's requests for information. In December of 1975, the plaintiff met with Maher, Naylor, and Sirota and requested certain information from them. The plaintiff made similar requests of Maher in Baltimore in February of 1976. On April 27, 1976, the plaintiff wrote to Sirota again requesting information. Finally, on April 29, 1976, when Hamm, a member of Sirota's law firm, wrote to the plaintiff's lawyer, he acknowledged the requests for information and said the plaintiff could inspect SCR records if he so desired. At the bottom of Hamm's letter there is a notation that a copy was sent to Maher, Naylor, and Shaughnessy.
 
 
 46
 These meetings and letters demonstrate two things: all four of these defendants (1) knew of the plaintiff's requests for the information and (2) knew that as late as April 29, four days before the CRS shareholders vote to approve the merger, the plaintiff had not yet received all the information he had requested. If the information was material, then there was a jury question as to whether these four defendants acted recklessly in failing to ensure that the plaintiff received the information he requested.
 
 
 47
 This is not a case like McLean v. Alexander, 599 F.2d 1190 (3d Cir. 1979), where we held that there was insufficient evidence of the scienter of accountants with a rather peripheral connection with the transaction. Here, the defendants knew the plaintiff's requests for allegedly material information had not been complied with. See note 3 supra. We hold that there was sufficient evidence to create a jury question as to the scienter of Maher, Naylor, Shaughnessy, and Sirota.
 
 3.
 
 48
 Finally, Levi argues separately that there was insufficient evidence of his scienter as a matter of law. Unlike the other four individual defendants who have appealed, who all were officers and/or directors of SCR. Levi was only a shareholder in SCR. Levi admits that the district court's charge was correct. It told the jury:
 
 
 49
 Before you can find Mr. Levi liable as a controlling person, insider or aider and abettor, you must find first that one or more of the other defendants committed a wrongful act and secondly, that the alleged controlling person, insider or aider and abettor had knowledge of the wrongful act and third, that the alleged controlling person, insider or aider and abettor rendered substantial assistance in effecting the wrongful act. Of course, that could (be the case) if circumstances are such (that he failed) to use his alleged control over other persons to stop whatever it is that they are alleged to have done.
 
 
 50
 See generally Monsen v. Consolidated Dressed Beef Co., 579 F.2d 793, 799-803 (3d Cir.), cert. denied, 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978).
 
 
 51
 The crux of Levi's argument is that he did not know that material information was withheld from the plaintiff. We hold that there was sufficient evidence to create a jury question for several reasons. First, contrary to what Levi suggests, there was evidence that once SCR was set up, Levi did not assume the passive, non-managerial role of the normal shareholder. His own deposition, read into the record, revealed the following:
 
 
 52
 Q: Do you know how they (the SCR board of directors) were selected?
 
 
 53
 A: No special way that they were selected.
 
 
 54
 Q: Did you have any input into that?
 
 
 55
 A: Yes.
 
 
 56
 Q: Was Mr. Shaughnessy your representative on the Board?
 
 
 57
 A: They were all my representatives.
 
 
 58
 Q: Could you have influenced the Board of Directors of SCR at that time?
 
 
 59
 A: With all of my money paying for everything, yes.
 
 
 60
 Second, there was circumstantial evidence that Levi was involved in some way with the negotiations with the plaintiff over the sale of the plaintiff's CRS stock to SCR. For example, the plaintiff testified that during these negotiations Maher told him that Shaughnessy (who was the vice president at Mercantile, where Levi was vice chairman of the board) was Levi's representative on the SCR board. Indeed, Levi's deposition reads:
 
 
 61
 Q: Did (Shaughnessy) ever travel anywhere in connection with the program to purchase (CRS)?
 
 
 62
 A: I'm sure he traveled.
 
 
 63
 Q: Do you know who or on whose behalf he was working at the time he made the trip to Texas?A: Let me clarify the question. He was in the employ of the Mercantile Bank. His trip to Texas was a service to the corporation which Maher and Levi were the two stockholders. His compensation was to come out of the funds that I had agreed to put forward for that group for that entity to operate with.
 
 
 64
 Finally, there was some evidence that Levi may have known that at least four days before the May 3 CRS shareholders meeting to approve the merger, the plaintiff had not gotten the information he had requested. There is a notation on the bottom of Hamm's April 29 letter to the plaintiff's attorney that a copy of it was sent to Levi. See note 3 supra.
 
 
 65
 Thus this evidence demonstrates that Levi felt he could influence the other defendants, that Levi had some connection with Shaughnessy's trip to Texas to discuss a purchase of CRS stock by SCR, and that Levi knew the plaintiff had not received evidence requested from the other defendants. We hold this to be sufficient evidence of Levi's involvement in the events surrounding the disputed information to create a jury question on Levi's liability. As we noted in Monsen, supra :
 
 
 66
 (I)nvolvement (in the wrongful conduct of the other defendants) may be demonstrated by proof that the alleged aider-abettor "had general awareness that his role was part of an overall activity that is improper." . . . In determining this awareness, "the surrounding circumstances and expectations of the parties are critical."
 
 
 67
 579 F.2d at 799-800 (citations omitted).
 
 IV.
 
 68
 We will reverse the judgment and remand to the district court for further proceedings.
 
 
 69
 ALDISERT, Circuit Judge, dissenting.
 
 
 70
 The majority hold that a person who has sold securities pursuant to a merger he opposes has a federal claim under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and rule 10b-5, 17 C.F.R. § 240.10b-5, if the majority shareholders fail to disclose information that would allow him to obtain an injunction of the merger under state corporate law, notwithstanding the lack of necessity for his vote to complete the merger and the existence of state appraisal remedies for dissenting shareholders. I believe that Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), compels the conclusion that Healey's complaint fails to state a claim under the federal securities laws. I therefore dissent and would hold that the complaint should have been dismissed for lack of federal jurisdiction.
 
 
 71
 I disagree with the majority on several critical points. First, I believe they improperly apply the standards for materiality in securities actions, and thus deem Healey's allegations of materiality sufficient; in my view, the nondisclosures were actually not material as a matter of law. Second, the majority disregard the alternative rationale presented in Santa Fe. My reading of part IV of that decision indicates that Healey's action should be dismissed because it does not promote the policies of the federal securities laws and because it interferes with and usurps functions traditionally relegated to state corporate law. Finally, the majority err by implicitly assuming that only the federal courts can effectively protect minority shareholders from breaches of fiduciary duty owed them under state law by majority shareholders.
 
 
 72
 Although Healey alleges that the failure of the majority stockholders to disclose certain information about the corporations precluded him from seeking or obtaining a state injunction to prevent the merger, he fails to indicate why he could not have filed his state action on information and belief and then employed state court discovery to obtain the evidence necessary to enjoin the merger.[1] Now that Healey has been deprived of an injunction by the defendants' failure to disclose critical information, he seeks monetary damages through rule 10b-5. He fails to indicate, however, how the federal action protects his rights better than a state appraisal proceeding. Healey initially filed an appraisal action in Pennsylvania court, see Brief for Appellants at 16, and also notified Dr. P. Kendrick Maher, an officer and director of SCR, Inc., of his demand for a $300,000 appraisal of the stock in accordance with the Texas Business Corporation Act, id. at 15. Apparently, he could still avail himself of those remedies. Id. at 23. The rule 10b-5 action, therefore, merely duplicates relief currently available in state court.[2] Thus, I would not be inclined to imply a federal claim on these facts even if Santa Fe were distinguishable.
 
 I.
 
 73
 But, in my view, Santa Fe is not distinguishable, and this case requires careful inquiry into what that important decision actually held and what is logically compelled by the two separate lines of reasoning set forth by the Court in parts III and IV. Santa Fe holds that a breach of fiduciary duty by majority shareholders, without deception, misrepresentation, or nondisclosure, does not violate rule 10b-5. 430 U.S. at 476, 97 S.Ct. 1292. The majority deem Santa Fe irrelevant to this case, however, by noting that since Healey has alleged nondisclosure, the materiality analysis in part III of Santa Fe can be ignored by relying on a single footnote therein. In footnote 14 the Court stated that the alleged nondisclosures were not material because the plaintiffs' votes were unnecessary to effect the merger under the Delaware short-form merger statute and that the plaintiffs could not have obtained an injunction under state law even if the undisclosed information demonstrated that the transaction was unfair. Id. at 474 n.14, 97 S.Ct. 1292.[3] The majority assume that by alleging both nondisclosure and the availability of state injunctive relief, Healey can avoid the bar to the federal action set forth in part III of Santa Fe.
 
 
 74
 The majority commit a logical error by basing their analysis on the "negative implication" of footnote 14. See Kerrigan v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 450 F.Supp. 639, 644 (S.D.N.Y.1978). Although they disclaim reliance on the availability of injunctive relief by purporting to "ensur(e) a proper flow of information between the parties to a securities transaction," Maj.Op. at 646, that statement hides the real issue. The flow of information involved here can be "proper" under the majority's formulation only if it is important to an injunction action under state law. The major premise on which the majority implicitly rely is the Supreme Court's statement that the nonexistence of state injunctive relief rendered the nondisclosures in Santa Fe immaterial. From this the majority proceed to the facts at bar and note the undisputed existence of injunctive relief under Texas law for breaches of fiduciary duty. Using these two premises, they leap to a non sequitur, concluding that the existence of a state injunctive remedy, in and of itself, makes the nondisclosures material. The majority err in assuming that the existence of state injunctive relief is, in this context, the only component of materiality. Although no other component was mentioned in footnote 14 of Santa Fe, I am unwilling to accept the majority's reading of a footnote as the comprehensive statement on materiality in this important area of securities law. Such a broad reading of the footnote suggests that a different standard of materiality under federal securities law applies when state remedies are available than when they are not. I disagree with this position, which I deem fundamental to views announced in the majority analysis.
 
 
 75
 The prevailing definition of materiality in federal securities actions comes from TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), in which the Court set forth the following standard for materiality under rule 14a-9:
 
 
 76
 An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. This standard is fully consistent with Mills' (v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970)) general description of materiality as a requirement that "the defect have a significant propensity to affect the voting process." It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.
 
 
 77
 Id. at 449, 96 S.Ct. at 2132 (footnote omitted). Courts of appeals that have addressed the question have uniformly concluded that the TSC standard also applies to actions under rule 10b-5.[4]
 
 
 78
 The materiality standard in TSC Industries emphasizes the significance of the information to the "reasonable investor," in the sense that the omitted fact "would have assumed actual significance in the deliberations of the reasonable shareholder" as he contemplated his decision to cast his vote. 426 U.S. at 449, 96 S.Ct. at 2132. Just as materiality under rule 14a-9, which regulates disclosures in proxy statements, concentrates on the effect the information would have had on the investor's vote, Maldonado v. Flynn, 597 F.2d 789, 796 (2d Cir. 1979), materiality under rule 10b-5, which proscribes fraud or misinformation "in connection with the purchase or sale of any security," should center on information affecting the investor's decision to purchase or sell his securities. See O'Brien v. Continental Illinois National Bank & Trust Co., 593 F.2d 54, 59-60 (7th Cir. 1979).[5] Cf. Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 733-34, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) (language and legislative intent of section 10(b) require limitation of rule 10b-5 right of action to actual purchasers and sellers of securities).[6]
 
 
 79
 By deeming the allegations of materiality legally sufficient merely because Healey alleges availability of injunctive relief, the majority change the emphasis of rule 10b-5 from protection of the reasonable investor to protection of a certain type of litigant. Healey does not contend that the information would have enabled him to make a more informed investment decision. Indeed, he had no investment decision to make because his votes were unnecessary to complete the merger. As in Santa Fe, his options, either to tender his stock or seek appraisal, were fully disclosed to him. The purpose of the federal securities laws, to promote a full and fair disclosure, was fulfilled.
 
 
 80
 Accordingly, because Healey was unable to aver that he was deprived of "material information," an essential ingredient for a claim under rule 10b-5 as derived from the Supreme Court's decision in TSC Industries, I would hold as a matter of law that he has failed to state a claim, and would therefore dismiss his action.[7] This reason alone is sufficient to dismiss the action. More important, however, the majority have ignored the admonition of the Supreme Court in part IV of Santa Fe that the federal securities laws should not be read so expansively as to interfere with state corporate law.
 
 II.
 
 81
 The Court in Santa Fe set forth an alternative rationale to its analysis of materiality, stating in part IV that "even if (the language of the statute were not conclusive), there are additional considerations that weigh heavily against permitting a cause of action under Rule 10b-5 for the breach of corporate fiduciary duty alleged in this complaint." 430 U.S. at 477, 97 S.Ct. at 1303. When "a decision rests on two or more grounds, none can be relegated to the category of obiter dictum." Woods v. Interstate Realty Co., 337 U.S. 535, 537, 69 S.Ct. 1235, 1237, 93 L.Ed. 1524 (1949). Even if we were so disrespectful of the Supreme Court's teaching to label as dictum that which the Court has specifically characterized as an alternative rationale,[8] and therefore under the doctrine of precedent binding on this and other courts in the federal judicial hierarchy, see Allegheny General Hospital v. NLRB, 608 F.2d 965, at 969-970 (3d Cir. 1979), the court's statement constitutes a direction to the federal judiciary that the federal securities laws should not be expanded to usurp or interfere with functions traditionally relegated to state law. 430 U.S. at 478, 97 S.Ct. 1292. The Supreme Court has sounded this message repeatedly in recent years. As this court noted recently in Collins v. Signetics Corp., 605 F.2d 110, 113 (3d Cir. 1979):
 
 
 82
 In interpreting liability provisions of the acts, we must respect recent Supreme Court teachings that militate against excessively expansive readings. Thus, proof of an actual purchase or sale rather than a lost opportunity to purchase is necessary to recover for a violation of Rule 10b-5, Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), and scienter is necessary to establish a 10b-5 violation, Ernst & Ernst v. Hochfelder, (425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)). A defeated tender offeror has no implied cause of action for damages under § 14(e) of the Securities Exchange Act of 1934 or under Rule 10b-5, Piper v. Chris-Craft Industries, Inc., 430 U.S. 1, 42, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977). Without allegations of manipulation or deception, no 10b-5 cause of action exists for simple breach of fiduciary duty to minority stockholders. Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). Section 12(k) of the Exchange Act does not authorize the Commission to suspend trading in a security for more than one ten-day period on the basis of a single set of circumstances, SEC v. Sloan, 436 U.S. 103, 98 S.Ct. 1702, 56 L.Ed.2d 148 (1978), and an employees' non-contributory, compulsory pension plan is not a security within the meaning of the Securities Acts, International Brotherhood of Teamsters v. Daniel, 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979).
 
 
 83
 Since Signetics, the Supreme Court has once again reiterated its concern about overexpansion of the federal securities laws. In Transamerica Mortgage Advisors, Inc. v. Lewis, --- U.S. ----, ----, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979), the Court refused to imply a private action for damages under section 206 of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-6.
 
 A.
 
 84
 Notwithstanding these instructions that federal courts should be circumspect about expanding the federal securities laws, other courts that have considered the issue before us, as well as the majority here, have cavalierly dismissed part IV of Santa Fe. In Goldberg v. Meridor, 567 F.2d 209, 221 (2d Cir. 1977), cert. denied, 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978), the second circuit paid mere lip service to part IV of Santa Fe, stating simply that breach of fiduciary duty is no more relegated to state law than the theft involved in Superintendent of Insurance v. Bankers Life & Casualty Co., 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). The second circuit's vague and largely irrelevant discussion did not really come to grips with part IV:
 
 
 85
 Defendants rely also on the Court's fears of the difficulty of future line-drawing among various kinds of breach of fiduciary duty involving securities transactions. But this was said in support of drawing the line so as to require plaintiffs to make claims of nondisclosure or misleading disclosure, not as directing the lower courts to dismiss cases where it was claimed that fiduciaries had failed to disclose their self-dealing or had made a misleading disclosure, even though no disclosure was required by state law. Similarly we fail to see how defendants gain from the Court's quotation of its statement in the Superintendent of Insurance case, 404 U.S. at 12, 92 S.Ct. at 169, that "Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement" a statement that originally seemed intended only to remove negligent corporate misconduct from the reach of the statute. We readily agree that if all that was here alleged was that UGO had been injured by "internal corporate mismanagement", no federal claim would have been stated. But a parent's looting of a subsidiary with securities outstanding in the hands of the public in a securities transaction is a different matter; in such cases disclosure or at least the absence of misleading disclosure is required. It would be incongruous if Rule 10b-5 created liability for a casual "tip" in the bar of a country club, as we held in SEC v. Geon Industries, Inc., 531 F.2d 39 (2 Cir. 1976), but would not cover a parent's undisclosed or misleadingly disclosed sale of its overvalued assets for stock of a controlled subsidiary with securities in the hands of the public.
 
 
 86
 567 F.2d at 221 (footnote omitted). In a different context, the court stated cryptically that "(t)he nub of the matter is that the conduct attacked in (Santa Fe ) did not violate the ' "fundamental purpose" of the Act as implementing a "philosophy of full disclosure" ', 430 U.S. at 478, 97 S.Ct. at 1303; the conduct here attacked does." 567 F.2d at 218. I have set forth this entire "rationale" of Goldberg to facilitate proper evaluation of that decision as a precedent for other courts.
 
 
 87
 Similarly, in Wright v. Heizer Corp., 560 F.2d 236 (7th Cir. 1977), cert. denied, 434 U.S. 1066, 98 S.Ct. 1243, 55 L.Ed.2d 767 (1978), the seventh circuit recognized the policies elucidated in part IV, 560 F.2d at 246, but neglected to demonstrate why the legal precepts set forth therein should not have been applied to the facts before it. For a court inferior in a judicial hierarchy to recognize controlling precedent announced by a superior court is not enough; the court has a responsibility to apply that precedent to similar facts unless it sets forth reasons for not doing so. A fair reading of the seventh circuit's opinion fails to disclose why the Supreme Court's discussion in part IV of Santa Fe was inapplicable, and therefore not controlling. In Kidwell ex rel. Penfold v. Meikle, 597 F.2d 1273, 1292-93 (9th Cir. 1979), and Alabama Farm Bureau Mutual Casualty Co. v. American Fidelity Life Ins. Co., 606 F.2d 602, 613-14 (5th Cir. 1979), the ninth and fifth circuits merely adopted the holdings of Goldberg and Wright without setting forth reasons. We thus have a classic example of illicit precedential inbreeding in which a number of decisions are cited to support a legal precept, although none of them provides a fair statement of reasons for the conclusion.
 
 B.
 
 88
 The majority of this panel commit the same error. In dismissing the arguments regarding part IV of Santa Fe, the majority state:
 
 
 89
 Thus the problem in Santa Fe was not merely federal judicial intrusion into areas of state law, but rather federal judicial invasion of areas of state law without explicit federal statutory authority.
 
 
 90
 Here, by contrast, the plaintiff alleges that the defendants engaged in conduct expressly forbidden by the statute and the rule: an omission of certain information claimed to be material. That the harm to the plaintiff from the omission was deprivation of a state remedy in no sense diminishes the federal interest in preventing the omission and thereby ensuring full disclosure of all material information in securities transactions. Indeed, deprivation of state rights and remedies often forms the basis for federal claims. See, e. g., Hart & Wechsler's The Federal Courts and the Federal System 500-06 (2d ed. 1973).
 
 
 91
 Moreover, the federal courts have a duty under the supremacy clause of the Constitution to ensure that federal interests are vindicated. The Supreme Court has permitted use of the securities laws in the merger context where there has been misinformation that violates a specific federal provision. See, e. g., TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) (proxy rules). Thus we do not feel that Santa Fe can be read to force us to stay our hand from remedying the harm that flows from the very type of conduct to which specific federal statutory and regulatory provisions are addressed.
 
 
 92
 Maj.Op. at 646 (my emphasis). The majority merely reiterate a conclusion that the existence of a state injunction remedy sufficiently distinguishes this case from Santa Fe and, falling into the error of petitio principii, beg the question by articulating their assumption that federal interests are implicated. They do not examine the important policies that motivated the Court to include part IV of Santa Fe.
 
 III.
 
 93
 As its alternative rationale in Santa Fe, the Court, recognizing that the private right of action for damages under rule 10b-5 is an implied right of action, returned to the analytical framework employed to determine if a private plaintiff can maintain an action for damages when he is harmed by the defendant's breach of a federal statutory obligation. 430 U.S. at 477-78, 97 S.Ct. 1292. The Court announced the four-fold test for determining this question in Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), in which it refused to imply a private right of action for damages under 18 U.S.C. § 610, a criminal statute prohibiting corporate contributions to presidential campaigns. As subsequently interpreted, the four elements to be considered are: first, whether the statute was enacted for the benefit of a special class of which the plaintiff is a member; second, whether the legislature intended to create a private remedy; third, whether creation of a private remedy would further the underlying purpose of the legislative schema; and fourth, whether implication of a private remedy is inappropriate because the subject matter involves an area basically of concern to the states. See Cannon v. University of Chicago, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). I believe that Healey fails to satisfy the third and fourth requirements.
 
 A.
 
 94
 Healey's private action does not further the policies embodied in the securities laws. As the Court noted in Santa Fe, "the 'fundamental purpose' of the Act (is to implement) a 'philosophy of full disclosure'; once full and fair disclosure has occurred, the fairness of the terms of the transaction is at most a tangential concern of the statute." 430 U.S. at 477-78, 97 S.Ct. at 1303 (citation omitted). Although Healey does allege nondisclosure, the entire thrust of his state claim for injunctive relief would have been that the terms of the merger were unfair to him. By requiring him to demonstrate a reasonable probability of success in the state action, the majority require him to demonstrate unfairness to prevail on his federal claim. The majority thus deem concern for fairness, under the guise of nondisclosure, sufficient under the federal statutory schema to serve as a passport into a federal courtroom. Apart from its unjustified assumption that the concern for fairness cannot be vindicated in the state court system, see part IV infra, the failure of this approach is dramatically demonstrated by the effect of the federal action. Healey's action serves only to protect his state breach of fiduciary duty action, which deals with a concern fairness that is " 'at best a subsidiary purpose' of the federal legislation." 430 U.S. at 478, 97 S.Ct. at 1303 (citation omitted). Thus, Healey has succeeded in slipping through the back door what federal courts are loathe to let him do directly: He challenges the fairness of a state corporate transaction, using the majority's test of "a reasonable probability of ultimate success" in the state action, by asserting his claim under the federal securities laws.
 
 
 95
 Not only do I fail to see how federal evaluation of the transaction's fairness serves the purpose of the federal schema, I also fail to see how Healey's action promotes full disclosure. By creating a federal action under these facts, the majority do not provide a remedy in damages that is unavailable under state law. The measure of damages is the same; no additional monetary relief can be forthcoming under rule 10b-5. If the plaintiff here is successful in the federal action, the defendants will be required to pay the plaintiff the fair value of his stock.[9] This measure of damages is the same one available under state law, because if no federal action were implied, plaintiff would be limited to the parallel state court appraisal action, in which the defendants would also be required to pay the plaintiff the fair value of his stock.[10] If there is no additional relief in the federal forum, I fail to see how the availability of federal relief vindicates the commendable objective of full disclosure. Moreover, by the time the federal action accrues, the merger will be completed and injunctive relief will be impossible under both state and federal law. Thus, if a state appraisal proceeding, giving relief virtually identical to the federal action, does not currently promote sufficient disclosure for Healey's injunction action, I cannot understand how a federal rule 10b-5 action will.
 
 B.
 
 96
 Healey's action also enters an area traditionally relegated to state law, making his implied federal remedy inappropriate under the fourth test of Cort v. Ash. A clearer instance of a plaintiff asking federal courts to usurp state functions is difficult to imagine. The allegation is that the defendants violated federal law by withholding information critical to Healey's state claim. Not only does Healey's claim present an unpersuasive case for a federal remedy, it creates a startling irony. Under the majority's formulation, only if a plaintiff has a state claim for an injunction can he recover under federal rule 10b-5 for breach of fiduciary duty. If state injunctive relief is unavailable, as in Santa Fe, the plaintiff also has no federal remedy. Thus, rather than aiding plaintiffs under federal law who have no state remedy, the majority's formulation provides federal relief to plaintiffs who have state remedies, but denies federal relief to plaintiffs who have no state remedy! See Note, Goldberg v. Meridor: The Second Circuit's Resurrection of Rule 10b-5 Liability for Breaches of Corporate Fiduciary Duties to Minority Shareholders, 64 Va.L.Rev. 765, 776 (1978).
 
 
 97
 In Santa Fe the Court admonished against "extension of the federal securities laws" to the extent that they "overlap and quite possibly interfere with state corporate law." 430 U.S. at 479, 97 S.Ct. at 1304. By recognizing a federal action for the mere failure to release information relevant to a state action, the majority risk interference with state corporate law. As the Court noted in Cort v. Ash, 422 U.S. at 84, 95 S.Ct. 2080, and reiterated in Santa Fe, 430 U.S. at 479, 97 S.Ct. at 1304, investors commit their money to corporate directors and officers on the assumption that the corporation will be regulated primarily under state law, and that federal regulation will arise only when federal law "expressly requires certain responsibilities of directors with respect to stockholders . . . ." (emphasis added in Santa Fe ). This case does not present a situation in which the state has left corporate action unregulated. Nor does it present a situation in which the federal regulatory schema even arguably produces greater protection for investors. Rather, it presents a situation in which the investor, by mere allegation of nondisclosure, seeks to bring under federal law a claim clearly cognizable at state law. In the words of Santa Fe, "(a)bsent a clear indication of congressional intent, (I am) reluctant to federalize the substantial portion of the law of corporations that deals with transactions in securities, particularly where established state policies of corporate regulation would be overridden." 430 U.S. at 479, 97 S.Ct. at 1304.
 
 
 98
 The potential for interference with the normal development of state corporate law is illustrated by the difficulty federal courts have encountered in defining the elements a plaintiff must prove to obtain relief under rule 10b-5 in this situation. Courts that have addressed the materiality question have struggled to elucidate a standard that vindicates the perceived federal interest without overriding the state interest. As heretofore explained, the four courts of appeals that have addressed the issue have been most parsimonious in justifying the quaint notion that a federal action will not lie if no state relief is available, but will lie if a concurrent state remedy exists. These courts have disagreed in developing a test for when federal relief will be available. The courts have chosen from among several alternatives, including proof of the mere existence of a state injunctive remedy, proof of a prima facie case for the state remedy, proof of a reasonable probability of success in obtaining the state remedy, or proof of an almost certain probability of success in obtaining the state remedy. In Wright v. Heizer Corp., the seventh circuit noted that Illinois corporate law places the burden of demonstrating the transaction's fairness on the fiduciary, and concluded that the fiduciary's inability to prove fairness to the federal court would make the nondisclosures material and allow recovery under rule 10b-5. 560 F.2d at 250. In Goldberg v. Meridor, the second circuit apparently concluded that the nondisclosures were material if they had "lulled the minority stockholders" into foregoing state injunctive remedies. 567 F.2d at 220.[11] In Kidwell ex rel. Penfold v. Meikle, the ninth circuit, assuming that a state injunction claim could have been brought, emphasized the importance of the information to a reasonable shareholder's decision to seek the state remedy. 597 F.2d at 1293. The fifth circuit in Alabama Farm Bureau Mutual Casualty Co. v. American Fidelity Life Insurance Co., 606 F.2d 602, 614 (5th Cir. 1979), required the plaintiff to demonstrate only a prima facie case for the state remedy. The majority here rely on the shareholder's "reasonable probability of ultimate success" in obtaining the injunction if appropriate disclosures had been made, but fail to provide reasoned discourse on the effect the nondisclosures had on the plaintiff's decision not to seek the state remedy. Maj.Op. at 647.
 
 
 99
 This development of the materiality standard demonstrates the difficulty federal courts are having, and will continue to have, in expansively construing the federal securities laws while attempting to avoid conflicts with state corporate law. In each case, the federal court must immerse itself in an extensive inquiry into the existence of state remedies, the elements of the state action, the evidentiary sufficiency as perceived by the state court, and the plaintiff's perception of his case in state court. When the state law is unclear, as may often be the case, the court must speculate on each of these issues, hopelessly involving itself, and the federal securities laws, in matters of state corporate law.[12]
 
 
 100
 The majority justify this encroachment on the state schema by casually asserting that "deprivation of state rights and remedies often forms the basis for federal claims. See e. g., Hart & Wechsler's The Federal Courts and the Federal System 500-06 (2d ed. 1973)." Maj.Op. at 646. Even if the majority's premise, that state claims "often" underlie federal claims, were correct, the conclusion neglects the Supreme Court's clear admonition that the federal securities laws were not intended to absorb state corporate law. But the premise is clearly incorrect, as developments in the last decade demonstrate. The examples given by Professors Hart and Wechsler involve federal habeas corpus review of state court convictions and Supreme Court review on direct appeal of deprivations of federal constitutional rights in state court proceedings. Neither example is analogous because both concern conflicts between federal and state law in situations, unlike this one, in which the federal interest is explicitly stated in the Constitution. In addition, the Supreme Court has more recently tended to defer to state court resolutions of these federal claims, emphasizing, in the context of habeas corpus writs, the importance of limiting federal intrusion into state affairs. See Stone v. Powell, 428 U.S. 465, 491 n.31, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); Francis v. Henderson, 425 U.S. 536, 538-39, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976). The same emphasis on comity underlies the decisions in Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its progeny.[13] Just as those decisions mandate federal restraint when clear federal interests have been compromised, the considerations underlying those decisions mandate restraint in implying federal claims when the statutory basis for those claims is unclear.
 
 IV.
 
 101
 Most bothersome, however, is the implicit assumption by the majority that only federal courts can grant proper relief to an injured party whenever transactions in securities are involved. Traditional state remedies guarantee the plaintiff an appraisal procedure through which he can obtain the fair value of his stock. An action under rule 10b-5 guarantees him no more. Because it assures the plaintiff of no greater recovery than he could obtain in his state action, I cannot see how it promotes greater disclosure than the state action. Absent explicit legislative sanction, therefore, federal encroachment into this area is justified only if the federal courts do a superior job of administering the remedy. Legal commentators have stated explicitly the assumption the majority leave implicit. As one commentator has noted:
 
 
 102
 State fiduciary duty laws have not effectively redressed this imbalance. These laws impose a low standard of fiduciary duty, which has been further weakened by years of near desuetude and a tradition of case law interpretation favorable to corporate management. Moreover, the shareholder's ability to institute derivative suits based on such fiduciary duty laws has been limited, in several key jurisdictions, by procedural barriers, notably a requirement to post security for costs. Although corporate controllers thus have little to fear from these state laws, self-dealing transactions are still usually concealed from shareholders. It is such failure to disclose that allows these transactions to be reached by rule 10b-5, at least in cases where the breach of fiduciary duty involves a transaction in securities.
 
 
 103
 Note Suits for Breach of Fiduciary Duty Under Rule 10b-5 After Santa Fe Industries, Inc. v. Green, 91 Harv.L.Rev. 1874, 1876-77 (1978); see also 46 Geo.Wash.L.Rev. 861, 873 (1978). But as the Supreme Court has now made clear, the federal judiciary may not deem itself more capable than its state counterparts. Cf. Stone v. Powell, 428 U.S. 465, 493-94 n.35, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) (rejecting argument by Justice Brennan, dissenting, that federal courts are more expert in applying federal constitutional law).[14] Indeed, inasmuch as the contrived federal action is totally dependent on an already available state action, state judges are undoubtedly more experienced in this area than are federal judges. Because I cannot begin to accept the notion that federal judges have better expertise in state corporate law than state judges, I have no qualms about deferring to the state judiciaries and legislatures. Deference is supported by the admonitions of the Supreme Court regarding the breadth of the securities laws and its statements regarding the relationship of federal and state judiciaries.
 
 
 104
 Accordingly, because I cannot justify the majority's bold action in "federaliz(ing a) substantial portion of the law of corporations that deals with transactions in securities," Santa Fe Industries, Inc. v. Green, 430 U.S. at 479, 97 S.Ct. at 1304, I dissent. I would vacate the judgment of the district court and remand these proceedings with a direction to dismiss the action for lack of federal subject matter jurisdiction.
 
 
 
 *
 Honorable Daniel H. Huyett, 3rd, United States District Judge for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 SCR later changed its name to Catalyst Recovery, Inc., as is reflected in the judgment. We will refer to it throughout as SCR because that is the name used at trial by most of the witnesses
 
 
 [2]
 The letter stated:
 The information received about the proposed merger is woefully inadequate and is deficient in at least the following respects:
 
 
 [1]
 Failure to disclose the rationale for fixing the rate of exchange of the (CRS) common stock for the SCR preferred stock as called for in the merger proposal
 
 
 [2]
 Failure to disclose the identity of the persons who fixed the exchange rate called for in the merger proposal and whether any conflicts of interest exist that could affect the judgment of the persons who fixed the rate of exchange
 
 
 [3]
 Failure to furnish copies of recent audited financial statements of SCR so that a shareholder of (CRS) will have available to him material information he requires to determine whether to accept or reject the exchange offer called for in the merger proposal
 
 
 [4]
 The failure to obtain and provide to shareholders of (CRS) an independent evaluation of their (CRS) stock
 
 
 [5]
 The failure to obtain and provide to shareholders of (CRS) an independent evaluation of the SCR preferred stock
 
 
 [6]
 The general failure to provide other material information about SCR which would enable a shareholder to make an informed investment decision
 
 
 [3]
 The defendants argue that this offer means there was no omission of information. The jury could have believed, however, either that the offer came too late (it was four days before the CRS shareholders meeting) or that the plaintiff reasonably felt that the defendants were not serious. For example, at trial, the plaintiff testified in part as to why he did not follow up on the offer:
 Well, first the Baltimore group had a history of not providing any information for me. . . . The other reason I didn't go was my attorney told me they were to provide me information.
 
 
 [4]
 The plaintiff testified:
 Q: Can you tell us why you wanted this information?
 . . . .
 A: Yes. I had to make a decision before May 3rd. What was I going to do? My lawyers told me that I could have tried to obtain an injunction to stop the merger vote.
 Q: What's an injunction?
 A: This is an order from a court that would have stopped that merger.
 Q: Did you consider that at the time?
 A: Yes, we considered that.
 Q: Okay. Did you go and seek one?
 A: No, we did not.
 Q: Why not?
 A: We didn't have enough information to go to a judge and tell him that there's sufficient reason.
 
 
 [5]
 The district court charged:
 Plaintiff is further required to prove by a fair preponderance of the evidence that he suffered damages as a proximate result of the alleged misleading statements or omissions. In other words, the plaintiff must show that the misleading statement or omission played a substantial part in bringing about or causing the damages suffered by him and that the damage was either a direct result or a reasonably foreseeable result thereof.
 
 
 [1]
 Healey evidently built his rule 10b-5 action on information obtained through federal discovery. This must be so, since by proving the complaint without the information he deems material he would undermine his own action. Alternatively, if he did not have the information when he filed the suit, as would be the case if SCR, Inc. did not disclose, he must have acquired information sufficient to make a case through discovery. I will not assume that federal court discovery presents more thorough access to information relevant to a state injunction action than does state court discovery, which is more generally available to prosecute those actions. See Tex.Rules Civ.Proc. 167-70, 172, 176, 177a, 179, 186-86a, 189 (Vernon)
 
 
 [2]
 Injunctive relief for Healey became impossible when the merger was consummated
 
 
 [3]
 The full text of the footnote states:
 In addition to their principal argument that the complaint alleges a fraud under clauses (a) and (c) of Rule 10b-5, respondents also argue that the complaint alleges nondisclosure and misrepresentation in violation of clause (b) of the Rule. Their major contention in this respect is that the majority stockholder's failure to give the minority advance notice of the merger was a material nondisclosure, even though the Delaware short-form merger statute does not require such notice. Brief for Respondents 27. But respondents do not indicate how they might have acted differently had they had prior notice of the merger. Indeed, they accept the conclusion of both courts below that under Delaware law they could not have enjoined the merger because an appraisal proceeding is their sole remedy in the Delaware courts for any alleged unfairness in the terms of the merger. Thus, the failure to give advance notice was not a material nondisclosure within the meaning of the statute or the Rule. Cf. TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, (96 S.Ct. 2126, 48 L.Ed.2d 757) (1976).
 430 U.S. at 474 n.14, 97 S.Ct. at 1301 n.14.
 
 
 [4]
 In Woolf v. S. D. Cohn & Co., 515 F.2d 591 (5th Cir. 1975), the fifth circuit had applied a different test of materiality to a rule 10b-5 action, but the Supreme Court vacated that decision for reconsideration in light of TSC Industries. 426 U.S. 944, 96 S.Ct. 3161, 49 L.Ed.2d 1181 (1976). On remand, the fifth circuit applied the TSC standard. 546 F.2d 1252 (5th Cir. 1977) (per curiam). Other decisions by courts of appeals have also deemed the TSC standard of materiality controlling in rule 10b-5 actions. E. g., Steadman v. SEC, 603 F.2d 1126, 1130 (5th Cir. 1979); Goldberg v. Meridor, 567 F.2d 209, 218-19 (2d Cir. 1977), cert. denied, 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978); Alton Box Board Co. v. Goldman, Sachs & Co., 560 F.2d 916, 919-20 (8th Cir. 1977); Wright v. Heizer Corp., 560 F.2d 236, 247-48 (7th Cir. 1977), cert. denied, 434 U.S. 1066, 98 S.Ct. 1243, 55 L.Ed.2d 767 (1978)
 
 
 [5]
 In O'Brien, the Seventh Circuit addressed the failure of trustees, who were empowered to buy and sell securities for the plaintiffs, to disclose information relevant to plaintiffs' decision to terminate the trust. The court concluded that the information was immaterial under rule 10b-5 as a matter of law. Judge Tone, who had previously authored Wright v. Heizer Corp., 560 F.2d 236 (7th Cir. 1977), cert. denied, 434 U.S. 1066, 98 S.Ct. 1243, 55 L.Ed.2d 767 (1978), reasoned that the decision to terminate or maintain the trust relationship was not an investment decision, and thus that "a cause of action under § 10(b) should not be inferred." 593 F.2d at 60 (citation omitted). Judge Tone attempted to distinguish Wright in my view, unpersuasively by suggesting that abuse of the delegated power in O'Brien was a concern of state, not federal, law, whereas in Goldberg and Wright the plaintiffs had not delegated their investment decisions. Id. at 61. In my view, if the federal securities laws require disclosure of information material to state injunction actions, they also require disclosure of information relevant to a delegation of voting power. I, of course, reject both of these premises
 
 
 [6]
 I do not contest the majority's conclusion that Healey satisfies the purchaser-seller requirement of Blue Chip Stamps. Maj.Op. at 647
 
 
 [7]
 Even if the majority were correct in implying a federal claim, I would still disagree with their treatment of materiality. A plaintiff should be required to show that the facts omitted would have induced him to seek an injunction under state law and that those same facts would have been legally significant in his state action. The majority emphasize only the "reasonable probability of ultimate success in securing an injunction had there been no misrepresentation or omission." Maj.Op. at 647. This formulation fails to consider that a plaintiff need not have all the information necessary to obtain an injunction at the time he files suit. He can acquire much information through discovery. The critical inquiry, therefore, is whether the reasonable investor would have deemed the information significant in deciding whether to pursue injunctive relief. If he can meet that burden, he should also be required to meet the majority's materiality test to assure that the information is relevant and important to the state action, and to assure that he actually has a valid state law claim, Implicit in the majority's analysis is the requirement that the defendants actually were cognizant of the undisclosed facts, and nevertheless withheld them. See Kidwell ex rel. Penfold v. Meikle, 597 F.2d 1273, 1294 (9th Cir. 1979). It may also be necessary for the defendants to have understood the legal significance of the undisclosed facts to the state action. See note 12 infra
 
 
 [8]
 Eight justices joined part III of the Santa Fe opinion. Six justices joined part IV. Justices Blackmun and Stevens dissented from part IV because they considered it incorrect and unnecessary to the disposition of the case. 430 U.S. at 480, 97 S.Ct. 1292 (Blackmun, J., concurring in part); 430 U.S. at 481, 97 S.Ct. 1292 (Stevens, J., concurring in part)
 
 
 [9]
 In Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), the Court stated the measure of damages under § 28 of the 1934 Act, 15 U.S.C. § 78bb(a), as
 the difference between the fair value of all that the mixed-blood seller received and the fair value of what he would have received had there been no fraudulent conduct, . . . except for the situation where the defendant received more than the seller's actual loss. In the latter case damages are the amount of the defendant's profit.
 406 U.S. at 155, 92 S.Ct. at 1473 (citations omitted). This standard also governs damages in implied private actions under rule 10b-5 in this circuit. See Thomas v. Duralite Co., 524 F.2d 577, 586, 589 (3d Cir. 1975); Rochez Brothers, Inc. v. Rhoades, 491 F.2d 402, 411-13 (3d Cir. 1974), cert. denied, 425 U.S. 993, 96 S.Ct. 2205, 48 L.Ed.2d 817 (1976).
 
 
 [10]
 Appraisal actions in Texas, the law of which the majority assume to be applicable, are governed by the Texas Business Corporation Act, 3A Tex.Bus.Corp.Act Ann. art. 5.12 (Vernon Supp.1979), which allows recovery of "the fair value of the shares." A plaintiff may also recover special damages if the fair value does not accurately reflect his loss. Farnsworth v. Massey, 365 S.W.2d 1, 5 (Tex.1963). Given this supplemental recovery of special damages, a plaintiff in the state appraisal proceeding may be able to recover more in the state action by proving less than required in the federal rule 10b-5 action. A lower recovery in federal court is unlikely to promote greater disclosure and may actually encourage defendants to withhold information, thereby lessening their liability by encouraging plaintiffs, like Healey, to sue under federal law
 
 
 [11]
 The court in Goldberg also relied on the effect the nondisclosures would have on a "reasonable director," reasoning that the corporate entity itself can be deceived by the action of interested directors. 567 F.2d at 219. Although I have grave doubts about the validity of this theory, see Note, Goldberg v. Meridor: The Second Circuit's Resurrection of Rule 10b-5 Liability for Breaches of Corporate Fiduciary Duties to Minority Shareholders, 64 Va.L.Rev. 765, 772-74 (1978), I do not reach this issue because Healey, in contrast to Goldberg, is not suing derivatively. His action thus does not depend on deception of the corporation
 
 
 [12]
 District courts in the second circuit have encountered these problems in attempting to apply Goldberg. For example, in Kerrigan v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 450 F.Supp. 639, 646 (S.D.N.Y.1978), the court refused to speculate on future developments in Delaware corporate law. Another problem is whether the majority shareholders must know the legal, as opposed to financial, significance of the undisclosed information to the putative state remedy in order for the plaintiff to meet the scienter requirement of Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Cf. Helfant v. Louisiana & Southern Life Ins. Co., 459 F.Supp. 720, 725 (E.D.N.Y.1978) (under Goldberg, opinion of an outside investment banking firm is not a misrepresentation within rule 10b-5 unless plaintiff alleges intent, presumably to withhold information relevant to a state action)
 
 
 [13]
 Justice Black explained in Younger the reluctance of the federal judiciary to enjoin state criminal proceedings in terms that are also relevant to this case:
 This underlying reason for restraining courts of equity from interfering with criminal prosecutions is reinforced by an even more vital consideration, the notion of "comity," that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways. This . . . is referred to by many as "Our Federalism" . . . . What the concept does represent is a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States. It should never be forgotten that this slogan, "Our Federalism," born in the early struggling days of our Union of States, occupies a highly important place in our Nation's history and its future.
 401 U.S. at 44-45, 91 S.Ct. at 750-751.
 
 
 [14]
 See also Aldisert, On Being Civil to Younger, 11 Conn.L.Rev. 181, 214-225 (1979)