Homer Lee TUCKER, John David Woodall, and Jerre D. Weir, Appellants,

v.

UNITED STATES of America, Appellee.

Homer Lee TUCKER and John David Woodall, Appellants,

v.

UNITED STATES of America, Appellee.

Homer Lee TUCKER, Appellant,

v.

UNITED STATES of America, Appellee.

Nos. 24229–24231.

United States Court of Appeals
Fifth Circuit.

April 29, 1969.

Rehearing Denied in No. 24229
May 19, 1969.

John P. Farra, Clyde W. Woody, Marion S. Rosen, Houston, Tex., for appellant Woodall.

Edward Billingsley, Birmingham, Ala., for appellant Tucker.

Joel N. Lee, Miami Beach, Fla., for appellant Weir.

R. Macey Taylor, Asst. U. S. Atty., Birmingham, Ala., for appellee.

Before JOHN R. BROWN, Chief Judge, WISDOM, Circuit Judge, and BREWSTER, District Judge.

BREWSTER, District Judge:

Jerre Donovan Weir, Homer Lee Tucker, John David Woodall and wife, Carol Joyce Woodall, were jointly indicted for robbery of the federally insured Green Valley Branch of the First National Bank of Birmingham, Alabama, on June 3, 1965, by putting the life of one of its money custodians in jeopardy through the use of a pistol.

Each of the defendants pled not guilty at the time of arraignment in September, 1965. Both the Woodalls changed their pleas to guilty when the case was called for trial on February 21, 1966. Tucker and Weir went to trial before a jury. Tucker changed his plea to guilty in the absence of the jury after he had heard enough of the evidence to know that the government could prove his guilt beyond question. A severance was granted him, and the trial of Weir proceeded. The jury found him guilty.

Woodall was under two other indictments alleging robberies of federally insured institutions in or near Birmingham, under circumstances making the aggravated penalty under 18 U.S.C.A. § 2113(d) applicable. One of those indictments charged Woodall and Tucker with robbery of this same Green Valley Branch bank on April 29, 1965. Woodall also pled guilty to that robbery on February 21, 1966. The other case against Woodall was "passed generally."

Tucker had a total of six federal indictments pending against him when he changed his plea to guilty during the trial begun on February 21, 1966. One of them charged a Dyer Act violation; and each one of the others alleged a robbery of a federally insured institution, either a bank or a savings and loan association, by putting the life of the money custodian in jeopardy with a pistol. In the days intervening between his plea in the first case and the sentence hearing, Tucker secured the transfer of his three federal cases in Texas to the court in Birmingham for plea and sentence under Rule 20, F.R.Crim.P. On March 2, 1966, he was convicted and sentenced on his pleas of guilty in each one of his six cases.

Weir, Tucker and Woodall appealed. Mrs. Woodall did not. No question raised is common to any two appellants, but the matters urged by each of them are relevant to all of his convictions. For reasons that will be apparent, all of the appeals can best be disposed of in this one opinion.

Tucker, Weir and the Woodalls, all residents of Fort Worth, Texas, were good friends. While the case growing out of the bank robbery on June 3, 1965, was the only one in which all of them were jointly charged, Tucker and Woodall were named as co-defendants in the armed robberies on April 29, 1965, of this same bank and of a savings and loan association in Birmingham. Only Tucker was charged in the Dyer Act case and in the robberies of the two savings and loan associations in Fort Worth in October, 1964.

On June 1, 1965, Tucker, Weir and the Woodalls traveled from Fort Worth to Birmingham in two cars. The one the Woodalls were using was a canary yellow 1965 Chevrolet Impala Sport Coupe bearing white Texas license plates. Upon their arrival in Birmingham, Tucker got two rooms at the Travelodge Motel for occupancy by four people. The motel was a considerable distance from the bank they were going to rob; and on the following day, the Woodalls got one room at the Holiday Inn south of town, which put them only about half a mile from the bank.

Their plan contemplated that the two who engaged in the actual robbery of the bank would use a stolen car in the

arrival at and the departure from the bank, so that it could be abandoned quickly and would not be traced to any members of the party. Tucker and Weir were to commit the actual robbery, and the Woodalls were to rendezvous with them and take them and the loot in the Chevrolet to the room in the Holiday Inn nearby. In that way, they had a good chance to be off the streets before police patrol cars got a radio broadcast on the robbery. Even in case they did not get to the hideout that soon, officers would not be looking for a yellow Chevrolet occupied by three men and a woman.

Some time on June 2d, Tucker and Weir stole a white 1964 Ford bearing Florida license plates parked on the downtown streets of Birmingham. About noon on June 3d, they went to the bank in the stolen Ford and parked it nearby. Tucker told the officer in charge, "We want it all this time." Tucker went behind the teller cages, while Weir remained in front of them. They made the male bank officer and a female teller take over seven thousand dollars from two of the cages and put it into a pillow slip Tucker had. The man and woman were then made to lie face downward on the floor as Tucker and Weir left, and told not to report the robbery immediately. All of this was at gun point.

Tucker and Weir got into the stolen Ford, swerved around and left the parking area at the bank at a high rate of speed. They went to the rendezvous at the graveled side road or cut-off on the Old Columbiana Road, where they abandoned the Ford, got in the waiting yellow Chevrolet with the Woodalls, and went to the Holiday Inn.

The robbery might have gone unsolved except for a happenstance that connected the yellow Chevrolet with the white Ford seen at the bank, and for the fact that the unusual color of the Chevrolet made it easy to locate during a check at the motels.

Around noon on the day of the robbery, Mr. Schopf, the Territory Manager of White Motor Co. in Birmingham, had taken his family to the shopping center where the bank was located. As he was driving into the parking area, he saw a white 1964 Ford containing two men suddenly swerve around from the vicinity of the bank and leave the area at an excessive rate of speed. A little later, he saw a crowd around the bank and went to find out what had happened. While he was there, he told the police officers what he had observed about the white Ford. The officer replied that it was linked with the robbery, and had already been found abandoned at the cut-off on the Old Columbiana Road. Schopf then informed the officers that he had come by the cut-off around noon on his way from home to the shopping center, and had noticed a yellow 1965 Chevrolet Impala Sport Coupe, bearing white Texas license plates and containing a man and a woman, parked there.

The motel check led to the location of the yellow Chevrolet at the Holiday Inn at about 2:00 P.M., and the officers canvassed some of the people at the motel for information about the car. One of the guests was a woman who had been sunbathing by the swimming pool since before the Chevrolet drove in late in the noon hour. She had seen the three men and a woman get out of the car and go to room 122, and the woman return later for the men's coats and a canvas satchel. An investigation in the area of the rendezvous led to the finding of two teen-age boys who were walking along the road there around noon when the Chevrolet cruised by slowly within ten feet of them. The car had white license plates, and contained a man and a woman at the time they saw it. They went to the Holiday Inn to view the yellow Chevrolet there, and their best judgment was that it was the same Chevrolet which they had seen in the vicinity of the rendezvous.

With the information they had linking the yellow Chevrolet with some people who were in room 122, the officers went to that room. Woodall answered their

knock on the door, told them the yellow Chevrolet was his and said that he and his wife were the only people in the room. He refused to permit the officers to enter without a search warrant. One of the officers who had been connected with the investigation since the beginning then went before a magistrate, got a search warrant and returned to the motel at about 5:00 P.M. Some of the officers had remained at the motel and had had the room under surveillance at all times.

A search of room 122 was then made. Only the Woodalls were in sight when the officers went in. Tucker and Weir were found hiding behind the bathroom door. The canvas satchel containing the loot from the robbery and four pistols were found under the bed. Some of the money was identified by the bank from recorded serial numbers on the currency. A piece of paper was also found in the room with handwritten figures on it showing the total amount of money in the satchel and what the quotient would be when the total was divided by four.

A later, more thorough check of the room by the hotel manager led to the discovery in the air conditioning vent of the keys to the rooms Tucker and Weir occupied in the Travelodge Motel when they first got to Birmingham.

An examination of the objects connected with the robbery revealed a latent fingerprint of Weir on the stolen white Ford found abandoned at the place of the rendezvous, and one of his prints on the slip of paper bearing the figures showing how the money was to be divided.

Weir testified in his own behalf. He admitted making the trip from Fort Worth to Birmingham with Tucker and the Woodalls, and that he was with them just before noon on the day of the hijack-

ing. He claimed that they let him out for lunch just before noon and that he had no connection with the robbery. He was unable to explain how his fingerprints got on the white Ford used in the getaway and on the slip of paper with the division figures on it.

During the period the officer was gone to get the search warrant, Tucker, in the presence of his three confederates, placed a long distance telephone call to a professional bondsman in Fort Worth to get over to Birmingham to make their bonds. Their standing with the bondsman was good enough that he made the trip to Birmingham and sprang Tucker, Weir and Woodall on more than sizeable bonds. Weir's, for instance, was $25,-000.00.

Each of the defendants was well represented by competent counsel.

We have examined Weir's claims that the search of the Woodall room was invalid, that the trial court should not have permitted the government to develop on cross-examination of him that he had recently been convicted of a violation of the Dyer Act,[1] and that counsel for the government indulged in improper argument. After due consideration, we have reached the conclusion that the record discloses no error in regard to those matters, and that they do not have enough merit to require extended discussion. The record is free of reversible error as to Weir.

Tucker claims that the proceedings on his pleas of guilty to the charges contained in the six indictments against him did not comply with Rule 11, F.R. Crim.P. These claims are frivolous. The proceedings were before the effective date of the amendment to Rule 11, and more than satisfied the requirements

---

1. It is not clear from Weir's brief just what his complaint is about being cross-examined about his prior conviction. It is subject to the interpretation that he could offer himself as a witness with perfect immunity from being interrogated about a felony conviction. The law on that proposition is too well settled against him to require citation of cases. There

could be no claim of remoteness, as the conviction was comparatively recent. He was required to give answers only as to whether he had been previously convicted of a felony, as to what the felony was and as to when the conviction was had. Those questions were proper. Martin v. United States, 10 Cir., 404 F.2d 640, 643 (1968).

of the rule as it then existed. United States v. Rizzo, 7 Cir., 362 F.2d 97 (1966). Claims similar to his, where defendants contended that they were frightened into pleading guilty, when their lawyers told them about the possible maximum penalties, have been rejected by the courts. Lattin v. Cox, 10 Cir., 355 F.2d 397 (1966); Rogers v. Wainwright, 5 Cir., 394 F.2d 492 (1968). Defense counsel correctly tried to impress Tucker with the seriousness of his pending charges and advised him of the possible consequences of a conviction. The record shows no reversible error as to any of Tucker's convictions.

While Tucker claims that he was overawed by having advice as to his maximum possible penalties, Woodall says that he was not awed enough by the information he got. The record fails to show that he was informed, before he entered his pleas of guilty, as to the maximum possible penalties he was facing. He received sentences of twenty years in each one of his cases, to run concurrently, and made indeterminate by the Court's application of 18 U.S.C.A. Sec. 4208(a)(2) to them. It is our judgment that this situation requires a remand of the case to the trial court for an evidentiary hearing to determine whether Woodall knew the maximum possible penalties, rather than a reversal by this Court of his convictions. Lane v. United States, 5 Cir., 373 F.2d 570 (1967). It is well settled that a plea of guilty is invalid as not being understandingly entered if the defendant does not know the maximum possible penalty for the offense. Marvel v. United States, 380 U.S. 262, 85 S.Ct. 953, 13 L.Ed.2d 960 (1965). The question, however, is not whether he learned of such penalty from the judge, in a formal proceeding, but whether he had knowledge as to such matter, whether it was from the judge, his lawyer, his bondsman, or from some other source. Kotz v. United States, 8 Cir., 353 F.2d 312 (1965); United States v. Kent, 7 Cir., 397 F.2d 446, 451 (1968). Woodall's cases will be remanded to the trial court for the limited purpose of hearing

and determining whether he knew the maximum possible penalties for the charges to which he pled guilty. If it should be found that he did not, the trial court will set aside his convictions and grant him a new trial. If it should be found that he did, the judge will make his findings and conclusions, and direct that the record of that proceeding be returned to this Court.

The judgment of conviction in Weir's case is affirmed. The judgments in all of Tucker's cases are also affirmed. The two cases involving Woodall are remanded, insofar as they affect him, for further proceedings consistent with this opinion.