**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Calvin Wayne DOW, Jr., Defendant-
Appellant.
No. 18896.**

United States Court of Appeals,
Seventh Circuit.

Feb. 8, 1972.

Nicholas Karzen, Chicago, Ill., for defendant-appellant.

Stanley B. Miller, U. S. Atty., William A. Kerr and Charles H. Scruggs, Asst. U. S. Attys., Indianapolis, Ind., for plaintiff-appellee.

Before KNOCH, Senior Circuit Judge, KILEY, Circuit Judge and CAMPBELL, Senior District Judge.*

CAMPBELL, Senior District Judge.

On February 12, 1970 a federal grand jury in the Southern District of Indiana, Terre Haute Division, returned an indictment charging the defendant, Calvin Wayne Dow, Jr., with first-degree murder committed at the United States Penitentiary at Terre Haute. The indictment charged that on November 23, 1969 the defendant, then an inmate of the penitentiary, murdered one Edward Louis Knox, also an inmate, by stabbing him with a knife, in violation of 18 U.S. C. § 1111. A jury trial commenced on September 14, 1970 and at the conclusion of the government's case the court withdrew the charge of first-degree murder from the jury. The lesser-included charges of second-degree murder and voluntary manslaughter were submitted to the jury. The defendant was found guilty of voluntary manslaughter and on October 2, 1970 was sentenced to ten years in prison, to be served consecutively with the sentence he was then serving.

A careful examination of the record below seems to reveal that this is not a case of obvious guilt on the part of the defendant. On the evening of November 23, 1969 the defendant, who had been assigned to J Unit, Cell 39, was seated with several other inmates at a table in the day room of the unit. The day room was located on a tier immediately beneath the cell tier. Edward Knox, a negro inmate who had been assigned to J. Unit, Cell 45, which was located near the defendant's cell, was observed entering the defendant's cell by one of the men in the day room area. The act of entering another inmate's cell was prohibited by both penitentiary regulations and inmate custom. At this time Knox was naked, soapy and carrying a pair of shorts. The inmate who first observed him testified that he was coming from the area of the unit's shower room.

Earlier that day Knox had received two separate and substantial over doses of a tranquilizer known as "Thorazine". The dosages had been incorrectly administered to Knox by a non-physician employee of the penitentiary's Medical Clinic. There was no evidence that the defendant knew that Knox, who was known to the defendant only by sight, had received this treatment.

Upon learning of Knox's entry into his cell, the defendant quickly walked to his cell and entered, the door automatically closing behind him. No one observed what then transpired inside the cell but upon hearing a loud commotion inmate John Hughes proceeded toward the defendant's cell. Upon opening the cell door, Hughes observed the defendant and Knox standing and holding each other. Both were covered with blood. The defendant shoved a knife towards Hughes who took it and then departed. Later he deposited the knife in a trash cart located in the day room area. Within a matter of seconds the defendant and Knox, still intertwined, came out of the cell. Knox was observed striking or attempting to strike several blows at the defendant as the defendant was apparently trying to pull away from Knox or push himself away from Knox. Knox collapsed to the floor of the tier and the defendant was immediately taken into custody by a security officer who had arrived on the scene. As previously stated, the government presented no witnesses who actually saw what occurred in Cell 39, nor was any evidence of motive presented.

Testifying in his own behalf the defendant admitted that he had killed Knox but stated that he had acted out of fear for his own life. The defendant re-

* Senior District Judge Campbell of the Northern District of Illinois is sitting by designation.

lated that upon entering his cell he discovered Knox, standing naked and staring with a wild or crazy expression in his face. Knox purportedly refused to respond to the defendant's inquiries as to why Knox was in the defendant's cell. According to the defendant, Knox then attacked him with a knife which had been hidden in the shorts carried by Knox. The knife, first encased in a sheath, became uncased during the struggle and the defendant, having gained possession of the knife, began to swing wildly at Knox thereby stabbing him numerous times. An autopsy performed on Knox's body revealed that several of the stab wounds were inflicted in the area of the upper back and the head of the deceased. The defendant further testified that after the cell door had been opened, he heard the security officer approaching and then placed the sheath from the knife in his back pocket. A search of the defendant after he had been take into custody revealed the presence of the sheath.

Dr. Franklin Brosgol, a physician then employed at the penitentiary (and who had prescribed the Thorazine for Knox, which was incorrectly administered by a nonphysician employee), testified that the dosage of the tranquilizer Knox had received would, in his opinion, render Knox non hostile, non aggressive, difficult to communicate with and "stuporous". The doctor further testified, however, that because the effects of this drug vary depending upon the individual recipient, he had no way of knowing with certainty how Knox might have reacted to the drug. There was also evidence that this physician had never examined Knox prior to pronouncing him dead.

Dr. Kenneth Ash, testifying for the defendant, stated that as Staff Psychiatrist of the United States Medical Center for Federal Prisons in Springfield, Missouri, he had examined Knox one year earlier. At that time he diagnosed Knox as a paranoid schizophrenic. He testified also that much larger doses of Thorazine than Knox had received on the day of his death could be administered to a patient without putting him to sleep, depending upon the state of mental agitation of the patient. He stated that the real effect of this drug is not noted until two or three days after administration. In his opinion the immediate effect of the drug upon Knox was open to serious question. His testimony further revealed that when he interviewed Knox in Springfield, Missouri he, the doctor, was fearful for his own person and that Knox could have had another "flareup" after his return from the Medical Center to the general prison population. Finally, and in response to a lengthy hypothetical question propounded by the district judge which incorporated a description of Knox's behavior throughout the day of his death, Dr. Ash testified that, in his opinion, Knox on that day had experienced a reoccurrence of his paranoid schizophrenia.

Against this background it can readily be seen that the testimony of the defendant was a crucial, perhaps pivotal, aspect of the case. On direct examination the defendant admitted that he was then confined in the penitentiary on assault and robbery charges and that previously he had been confined in both a state institution in Oregon and a federal penitentiary in California on similar offenses. On cross examination the prosecutor asked the following questions:

"Q. (Prosecutor) Calvin, have you ever been convicted of a felony?

A. (defendant) Yes.

Q. How many times?

A. Three, I think.

Q. When was your first felony conviction?

A. 1965.

Q. What was that for?

A. Unauthorized use of a motor vehicle.

Q. And where did that take place?

A. In Portland, Oregon.

Q. When did your next felony conviction occur?

A. At Oregon State Penitentiary.

Q. What was that conviction for?

A. Escape.

Q. From where did you escape?

A. From the prison farm.

Q. How did you effect your escape?

A. I was with another boy. He hit the officer.

Q. The other boy hit the officer?

A. Yes, he did.

Q. You didn't take part in hitting the officer?

A. No. I didn't.

Q. What else happened during the escape?

A. We took his keys and his car, took off.

Q. You stood by while the other fellow attacked the officer?

A. (Affirmative nod.)

Q. You stood by and watched?

A. Yes, I was there.

Q. You didn't assist in any manner in overpowering the officer?

A. I didn't hit the officer at all.

Q. Did you hold him?

A. No.

Q. What was your third conviction for?

A. It stemmed from that escape. Well, it is confusing. Even the records office is still confused on it, because there was three charges that stemmed from the escape that night at the farm—was auto theft, robbery, escape from official detention.

Q. You still say you have been convicted of a felony three times?

A. Well, I guess it would have to be. I guess it would have to be—well, see, I went to court the first time for the auto theft and on—then, on that time was the second time. And the third time was when I escaped from Lompoc Federal Correctional Institution. That is what I meant when I said three.

Q. And isn't it true that the fourth time you were convicted of armed robbery?

A. No.

Q. Well, when did your armed robbery conviction take place?

A. What I meant—I an confused on that. What I meant is the auto theft was the first time, the first felony I was convicted on. I would have to say there was three felonies that stemmed from the escape itself from the farm—the assault and robbery and escape from—or the auto theft.

Q. So there's four felony convictions?

A. (Affirmative nod.) And then the escape from Lompoc.

Q. Where did the armed robbery take place?

A. I don't recall any armed robbery.

Q. Well, you stated you were convicted of robbery.

A. Assault and robbery.

Q. Did you have a weapon when you effected the robbery?

A. I didn't have no weapon, no.

Q. Where did the robbery take place that you were convicted of?

A. Marion County, Salem, Oregon.

Q. And what did you rob?

Mr. Bauer: Your Honor, I am going to object at this time. The question has been asked whether he was convicted of these felonies. He has admitted it, and I don't think the details are relevant or material.

Mr. Scruggs: Shows the pattern of conduct, Your Honor.

THE COURT: I will sustain the objection."

The defendant contends that the conduct of the prosecutor during cross examination prejudiced him and deprived him of a fair trial. Specifically, the defendant asserts that it was improper for the prosecutor to inquire into and dwell upon the details of his previous convictions.

■ The rule is well established in this Circuit that a defendant who elects to testify is subject to impeachment, including impeachment by proof of prior convictions. United States v. Morefield, 411 F.2d 1186, 1188 (1969). However, although a defendant who takes the stand may be cross examined as to his prior convictions to affect his credibility as a witness, the examination should not be conducted in such a fashion as to prejudice the defendant before the jury. See United States v. Yarbrough, 352 F.2d 491, 493 (6th Cir. 1965). The examination must be limited to whether the defendant had previously been convicted of a felony, to what that felony was and to when the conviction was obtained. See Tucker v. United States, 409 F.2d 1291, 1294, n. 2 (5th Cir. 1969). In short, the cross examination should be restricted to the fact of the convictions, and the circumstances and details of prior criminal conduct should not be explored by the prosecutor. United States v. Smith, 353 F.2d 166, 168 (4th Cir. 1965); United States v. Tomaiolo, 249 F.2d 683, 687 (2nd Cir. 1957).

■■ As can be seen from the line of questions pursued by the prosecutor, with its excessive concentration on the prior criminal acts of the defendant, an attempt was made to destroy the character of the accused and not merely to impeach him as a witness. The line of questioning employed tended to portray the defendant as a dangerous criminal, likely to commit any offense. Indeed, the prosecutor admitted that this was his purpose when, in resisting defendant's objection to some of these questions, he stated that they "show the pattern of conduct." Such a tactic by the prosecution is reprehensible and goes well beyond the limitations of permissible cross examination. See United States v. Tomaiolo, 249 F.2d 683, 687 (2nd Cir. 1957). Questions of this nature, since their effect is to show criminal propensities, unfairly prejudice the defendant as to his guilt or innocence of the specific crime charged. Guilt must be predicated upon evidence relevant to the offense charged, and not founded upon past crimes. See United States v. Yarbrough, 352 F.2d 491 (6th Cir. 1965).

The government's contention that the defendant has waived the issue of the prosecutor's conduct because of his failure to object to each of the questions asked is not persuasive. We consider the conduct of the prosecutor here so prejudicial that it amounted to plain error "affecting substantial rights" of the accused and cognizable under Federal Rule of Criminal Procedure 52(b).

■ Moreover, other conduct of the prosecutor seems to have prejudiced the defendant and deprived him of a fair trial. Immediately after the court had sustained the defendant's objections to the above line of questioning the prosecutor then asked: "Now, isn't it true that while you were at the institution there in Oregon that you led a race riot?" The defendant's objection was sustained and the prosecutor was admonished not to pursue that type of question. Despite the admonition the prosecutor's next question was "Were you ever involved in a riot?" A defense objection was again sustained. The prosecutor was not deterred, however, for he next asked "Did you ever have a fight with an inmate named Mariono?" Recognizing the prejudicial nature of these questions, the district judge once again sustained an objection by the defendant. The prosecutor was again admonished and the jury was instructed not to draw any adverse inference from these improper questions.

Although the jury was given a cautionary instruction regarding these questions, in our judgment the damage done was so extensive and serious that it could not be removed by an instruction. See United States v. Rudolph, 403 F.2d 805, 806–807 (6th Cir. 1968). The indelible impression left with the jury was that the defendant hated negroes and that previously he had acted out his animosity in an overtly violent fashion. Questions like those propounded here

are, of course, improper for two reasons. First, and perhaps most significantly, appeals to racial prejudice have no place in the courts of this country. United States v. Grey, 422 F.2d 1043, 1046 (6th Cir. 1970). Also, it is improper during cross examination to question a defendant as to prior wrongful acts not resulting in a conviction. See United States v. Rudolph, 403 F.2d 805, 806 (6th Cir. 1968) and cases cited therein.

We conclude that the conduct of the prosecutor described above was improper and operated to deprive the defendant of his right to a fair trial. Because a new trial is required we need not pass upon the other contentions of error raised by the defendant.

The judgment of conviction entered below is reversed and the cause is remanded for a new trial.

KILEY, Circuit Judge (concurring).

I concur in Judge Campbell's opinion that the conduct of the prosecutor in the above cause requires reversal of Dow's conviction.

I agree that "the rule is well established in this Circuit" that a defendant who testifies is subject to impeachment by proof of prior convictions. I merely note my reservation with respect to that rule as applied in cases in this Circuit. I have consistently hesitated to agree that the rule "contemplates in all cases, as a mere exercise of discretion, use of prior convictions" in impeachment. See my concurring opinions in United States v. Escobedo, 430 F.2d 14, 21 (7th Cir. 1970), and United States v. Gornick, 448 F.2d 566 (7th Cir. 1971). I favor the "rule of thumb" used in the District of Columbia Circuit and substantially contained in Rule 609(a), Proposed Rules of Evidence for United States Courts and Magistrates, which limits the trial court's discretion, as to evidence of prior convictions, to *"crimen falsi"* which bear on the witness's credibility.