**COLUMBIA PLAZA CORPORATION, John McShain, Inc., Appellants,**

v.

**SECURITY NATIONAL BANK, et al.**

**COLUMBIA PLAZA CORPORATION, et al., Appellants,**

v.

**SECURITY NATIONAL BANK, et al.**

**Nos. 78–1496, 78–1606.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 31, 1980.

Decided April 23, 1982.

Dorothy Sellers and Neil Levy, Washington, D. C., for appellants. Warren K. Kaplan, Washington, D. C., also entered an appearance for appellants.

Jeffrey D. Komarow, Washington, D. C., with whom Ronald D. Eastman, Washington, D. C., was on the brief, for appellees Lawrence M. Rothman and Lawrence M. Rothman Associates.

Albert J. Ahern, Jr., Bailey's Crossroads, Va., for appellee Charles J. Piluso.

Frank F. Roberson, Washington, D. C., with whom William A. Bradford, Jr., Washington, D. C., was on the brief, for appellees Security Nat. Bank, et al.

Peter Pomponio, pro se.

Before TAMM * and WALD, Circuit Judges, and JOYCE HENS GREEN,** United States District Judge for the District of Columbia.

Opinion for the court filed by District Judge JOYCE HENS GREEN.

JOYCE HENS GREEN, District Judge:

This is, as appellants aptly caution, a large case. Through its course of five and one-half years' vigorous litigation, almost 400 pleadings were filed on behalf of the seventeen parties. The trial itself lasted five weeks, generating substantial documentation, producing the testimony of numerous witnesses, and leaving a transcript legacy of 26 volumes containing more than 2,500 pages.

In the case below, John McShain, Inc. ("JMI") and its wholly-owned subsidiary, Columbia Plaza Corporation ("CPC") sued the fifteen defendants alleging that they had been damaged by the defendants as a consequence of the exhaustion of the proceeds of a construction loan before an office building, in which JMI and CPC has an interest, was completed. The various defendants consisted of six individuals surnamed Pomponio (Louis, Jr.; Peter; Paul; Mary Lou; Carolyn; and Judith); two Pomponio-controlled companies (National Center Corporation ("NCC") and National Realty & Construction Co., Inc. ("NRCC")); an architect and his architectural firm (Lawrence M. Rothman and Lawrence M. Rothman Associates); a Pomponio group lawyer and corporate official (Charles Piluso); an officer of Royal National Bank (Sid-

ney Zneimer [1]); and Royal National Bank and its successors, Security National Bank and Chemical Bank ("the Banks"). The complaint also sought declaratory relief against the Banks' enforcement of JMI's guaranty of the loan at the eventual foreclosure sale of the building and of three notes earlier executed by JMI in connection with construction of the building. The Banks counterclaimed against JMI and CPC for the deficiency that resulted from the foreclosure sale, against JMI on the three notes referred to above, and against JMI and CPC on two letters of credit. Upon the premature exhaustion of the construction loan funds arose what became the overriding question for resolution at trial: who bore ultimate responsibility for the shortfall?

Both JMI and CPC charged that all defendants had conspired to commit fraud against them by diverting the construction loan funds away from their intended purpose. On special interrogatories the jury found that none of the defendants defrauded either plaintiff company.

Additionally, CPC alleged that the negligence of all defendants, save the Pomponio wives, Rothman, and Rothman Associates, had caused it damage by allowing the diversion of the funds. Negligent misrepresentation was charged to the Rothman defendants for their allegedly inaccurate reports on the progress of construction. The jury found the following defendants negligent: Louis Pomponio, Jr., Peter Pomponio, NRCC, and Zneimer, but found no negligence on the part of the Banks, Paul Pomponio, NCC, or Piluso. While the jury found the Rothman defendants to have committed negligent misrepresentation, it also found CPC contributorily negligent and therefore absolved the Rothman defendants of liability.

CPC also complained that Louis Pomponio, Jr. and Piluso each owed it a fiduciary

---

* Circuit Judge Tamm did not participate in the disposition of these cases.

** Sitting by designation pursuant to 28 U.S.C. § 292(a) (1976).

1. Zneimer died three months after the trial.

duty which had been breached. The jury found that Louis Pomponio, Jr. breached the fiduciary duty he owed CPC; however, it did not find Piluso in breach of any such duty to CPC. JMI and CPC claimed that they were third-party beneficiaries of a loan guaranty contract executed by the six Pomponio individuals and that the contracts were breached; the jury found in favor of both plaintiffs on these claims.

With respect to the claim for declaratory relief regarding the Banks' enforcement of the guaranty and the three notes and the counterclaim on those and the two letters of credit, the jury, again by interrogatories, found CPC and JMI liable to the Banks for the foreclosure sale deficiency, CPC liable to the Banks for the letters of credit, and JMI liable to the Banks for the three notes.

A judgment was entered in accordance with the verdict. Joint Appendix (J.A.) 232–35. Subsequently, the trial court entered an amended judgment against JMI jointly and severally with CPC and in favor of the Banks on the letters of credit counterclaim. J.A. 236–37.

JMI and CPC now appeal the judgment of the District Court. The members of the Pomponio group against whom judgment was entered (the individuals and NRCC) cross-appeal the judgment.[2]

To appreciate the complex transactions of this matter, which, through cause and effect and by design or inadvertence, have frequently obscured the obvious, it is necessary to unravel carefully the tangled network of activity that comprises the events which prompted this litigation.

The office building from whose construction the instant dispute evolved was built on land designated in 1960 as the "Columbia Plaza Urban Renewal Project," which then was blighted property near the State Department building in Washington, D. C. The District of Columbia Redevelopment Land Agency ("RLA") condemned, cleared, and prepared the land for redevelopment by private enterprise.

Appellant CPC was formed in May, 1960 for the purpose of developing the Columbia Plaza land. In 1961 or 1962 John McShain obtained approximately 26 percent of the stock of CPC in return for his agreement as president of appellant JMI to erect an apartment complex on a portion of the land known as the "FHA portion," the portion of the land encumbered by FHA requirements. By 1970, JMI obtained a controlling interest in CPC.

In 1966 CPC purchased the conditional fee simple title to the Columbia Plaza land. The special warranty deed by which RLA conveyed the land to CPC required it to construct an apartment building on the FHA portion of the land and a hotel on the non-FHA portion. JMI undertook the construction of the apartment building, which it completed in 1968.

In early 1968, before the apartment building was completed, JMI began excavation of the non-FHA portion of the land for construction of the hotel. The excavation effort stopped in April, 1968. Although the RLA special warranty deed required that a hotel be constructed on the site, JMI determined that a hotel in that area of the city would be unprofitable. As such, JMI asked RLA for permission to construct an office building on the non-FHA plot. In August, 1970 RLA granted JMI permission to build an office building on the site instead of the hotel, for an additional consideration. The deed of the land to CPC was amended to reflect the change in use.

Thereafter, JMI, through Paul Fry, then vice president of CPC and secretary-treasurer of JMI (and John McShain's "right hand" officer), negotiated with the Pomponio interests for the construction of the office building by the Pomponios. Louis J. Pomponio, Jr., Peter Pomponio, and Paul Pomponio, three brothers, were "principals"

---

**2.** Defendant Peter Pomponio, a non-lawyer, appeared at trial *pro se* and was granted permission by the trial court to represent all the other Pomponios and Pomponio interests. He so proceeds here in the Pomponio cross-appeal.

He states that Judith Pomponio "is not now included in the Pomponio group," noting her divorce from Paul Pomponio and her voluntary petition in bankruptcy.

of various corporations in the construction industry. Louis, Jr. and Pomponio lawyer Piluso discussed the non-FHA parcel with Fry in early 1970. JMI was pressed to make certain that construction was not delayed, because it had received ultimatums from RLA to start the building or face RLA's exercise of its right to recover all of the Columbia Plaza land, including the portion upon which the apartment complex was built.

Because CPC was unable under the RLA deed to transfer title to the property until the office building was completed, JMI and the Pomponios arranged that the Pomponios would complete construction of the building for $13 million and would have an option to purchase the land upon completion for approximately $5.4 million. This agreement was reached by Fry and Louis Pomponio, Jr. in November, 1970 and memorialized by a writing in June, 1971. The Pomponio corporation NCC would purchase the site; NRCC served as the general contractor for the office building.

The Pomponio interests arranged the construction financing for CPC, the borrower, with the concurrence and assistance of JMI. The financing was obtained from appellee Royal National Bank, which had dealt with the Pomponios on a number of previous occasions, beginning in 1965. The $13 million construction loan closed in two parts: $2.3 million on August 25, 1970, and $10.7 million on November 20, 1970. At each closing, CPC executed a note to Royal for the loan amount, and, as security for each note, a deed of trust on the Columbia Plaza property. JMI unconditionally guaranteed to Royal the due performance and prompt payment of CPC's obligations. Paul Fry was heavily involved in consummating the financing, and JMI's guarantees of the CPC loans were executed by Fry under his unrestricted power of attorney from McShain. At the second closing, the six individual Pomponios guaranteed to Royal the due performance and prompt payment of CPC's obligations to Royal. As part of the guaranty, JMI expressly waived all notices to which it might be entitled and relinquished "all rights and remedies accorded by applicable law to guarantors."

In furtherance of the arrangement between CPC and the Pomponio group, JMI placed Louis Pomponio, Jr. on CPC's board of directors, and elected him vice president of CPC. Charles Piluso was also placed on the CPC board, and also took the office of secretary-treasurer. Fry remained president and a director. The two remaining directors of CPC were employees of JMI. CPC's books and records, including the corporate checkbook, were removed from Washington to Pomponio headquarters in Virginia. Fry and Louis Pomponio had exclusive control over the corporate checkbook, and could issue checks either alone or jointly. However, when the books were transferred to Pomponio headquarters, Fry effectively yielded all control over CPC's accounts to Louis Pomponio.

John McShain testified that he was unaware that JMI guaranteed the construction loan notes and CPC's performance; while he had received a copy of the guaranties, he stated that he "never read documents," and he generally left that to his manager. 3 Tr. 125–26; 4A Tr. 29–30.

McShain had "suspicions about [the Pomponios] from the beginning" and did not trust them. As such, he made repeated, but unsuccessful, efforts, through Fry, to obtain construction reports from the Pomponios while the office building was being erected.

During the time McShain was becoming distrustful of the Pomponios, Sidney Zneimer was the loan officer of Royal National Bank in charge of administering the construction loan. From October 5, 1970 through July 24, 1972, Zneimer received $178,000 in payments to him individually or to the corporation he controlled. Zneimer failed to report the payments as income and was convicted of tax fraud and for receiving a bribe as a federal bank officer, the bribe conviction relating to pre-1970 payments. Zneimer admitted at trial that he may have been influenced by the receipt of payments to advance the construction loan proceeds faster than was appropriate to the progress of the building. There was con-

flicting testimony as to whether the advances were justified; however, more than half the loan proceeds were advanced within 60 days of the commencement of construction, and the loan funds were indeed exhausted before the building was finished. All monies advanced by Zneimer were paid directly into CPC's bank account.

Royal enlisted Lawrence M. Rothman Associates to perform inspections of the construction site and to provide progress reports. Inspections were made by Rothman Associates until at least February, 1972.

Royal National Bank merged into Security National Bank on May 8, 1972. On May 25, 1972, Zneimer resigned as vice president of Royal, after the president of Security National Bank confronted him and asked if he had received payments from the Pomponio interests. Zneimer denied receiving the payments.

At this point, Security, by its loan officer, Stephen Corriss, began administering the Columbia Plaza loan it had inherited from Royal. Corriss realized that the $1 million of the loan which had not been advanced would be insufficient to ensure the building's completion. This remaining $1 million was disbursed by Security in July, 1972. Of the sum, $175,000 went to John Hancock Mutual Life Insurance Company for its commitment on a permanent loan of $17.5 million, and some $740,000 went, in part, for liens against the job and for federal and Virginia taxes owed by the Pomponios. Security made efforts to cooperate with JMI and the Pomponios and to secure additional financing for CPC so that the building could be completed and foreclosure avoided. The $175,000 payment to John Hancock was one such effort to obtain more financing. On August 7, 1972, Fry authorized Corriss to begin immediately to process an increase in the construction loan amount from $13 million to $17.5 million. However, on August 22, 1972, John McShain informed Fry that he would not agree to JMI's guaranteeing an increase in the loan. Consequent-

ly, the uncompleted building went to foreclosure on November 21, 1972. JMI and Security were the only bidders. JMI bought the land and the improvements at the sale for $13,650,500. With costs of the sale accounted for, a deficiency of $415,-480.74 was left, plus interest of 11% and attorney's fees under the terms of the note. CPC, at time of trial, owed $209,241.43 plus interest from July 23, 1971 until paid on a letter of credit issued by Royal in 1970 and $175,000 plus interest from January 2, 1973 until paid on a letter of credit issued by Security in 1972.

The appellants essentially suggest five trial errors in their appeal: first, that the Banks were not, but should have been, held liable for the negligence of their officer Zneimer; second, that the trial court did not provide the jury with proper instructions relevant to appellants' fraud theory; third, that appellants were not permitted to prove the existence of a conspiracy among defendants which, they argue, had been found by federal juries in two prior cases and were improperly restricted in their use of such evidence for impeachment purposes; fourth, that because of the errors alleged as to the question of the Banks' negligence and the proof of the fraud theory, a new trial is required on the Banks' counterclaims; and fifth, that the court failed to inquire into the reasonableness of the $187,-000 sum representing attorney's fees it ultimately awarded to appellee Banks pursuant to stipulations in the various debt instruments between them. Appellees argue vigorously to the contrary on these issues, appellee Piluso and the Rothman appellees adopting the Banks' thorough brief in addition to presenting their own.[3]

## I. THE JURY'S FINDING THAT THE BANKS WERE NOT NEGLIGENT

Appellants argue that the trial court erred in entering judgment for the Banks on the negligence claim and assert that the question of the Banks' vicarious liability

3. The Pomponio group presents no argument as to these issues in the brief filed on their behalf by Peter Pomponio. The Pomponio cross-appeal shall be discussed in part VI of this opinion.

was not submitted to the jury, but even assuming that the question of vicarious liability was properly submitted, the finding of no negligence on the Banks' part was necessarily inconsistent with the finding that Zneimer was negligent. Appellants accordingly suggest that their motion for a new trial (on the ground that the jury's verdict, to the extent that it refused to charge the Banks with Zneimer's negligence, was against the weight of the evidence) was improperly denied by the trial court.

In considering whether a court's charge to a jury was proper, it is important to be mindful of the difficulty of the trial court's task in formulating jury instructions that meet the acceptance of all of the disputing parties and yet adequately state the law with clarity and accuracy. In this case, for example, there was substantial discussion between counsel for the parties and the trial court as to the phrasing of the third of the three oral instructions on the vicarious negligence issue (set forth below), during which various and diverse instructions were proposed. 15 Tr. 91–101. Ultimately the court fashioned its own instruction from the several suggestions of counsel—an instruction of which counsel for appellants approved and which was given over the objection of the Banks. 15 Tr. 100.

At trial, appellants did not object to any of the three oral instructions on vicarious liability for negligence, which were presented to the jury as follows:

A corporation can act only through its officers, employees or other agents. Thus, any negligent act or omission of an officer, employee or agent of any of the plaintiff corporations or defendant corporations in the performance of his duties is held in law to be the negligence of the corporation.

An employer has a duty to properly supervise his employees, and failure to exercise ordinary care in such supervision creates liability on the employer where the employees' acts have harmed another.

A principal is not always responsible for the negligent acts of its agent. If you find that Mr. Zneimer was negligent in the administration of the Columbia Plaza loan and that such negligence caused damages to the plaintiff Columbia Plaza Corporation, but that the acts of negligence were done solely for Mr. Zneimer's own purposes and not for the Banks' purposes or were done solely in furtherance of interests of Mr. Zneimer adverse to the Banks and that the Banks retained no benefits from Mr. Zneimer's actions, then you may not attribute Mr. Zneimer's negligent acts to the Banks.

17A Tr. 157–58. As such, the law on vicarious negligence was presented to the jury. Appellants contend, however, that notwithstanding the presentation of these instructions, the jury was not given the opportunity to find the Banks vicariously liable for Zneimer's negligence because the written interrogatory submitted to the jury asked only whether various defendants had committed negligent *acts*, and did not ask any question relating to the issue of vicarious liability.

Indeed, the written interrogatory relevant to CPC's negligence claim (which, it must be emphasized, was *not* objected to by appellants at trial [4]) asked the jury whether the defendants listed therein "committed negligent acts" against CPC and only provided instructions as to duty of care and proximate cause.[5] It did not repeat the

---

4. The proper time to object to special interrogatories is at trial, not after the verdict has been returned. *Hild v. Bruner*, 496 F.Supp. 93, 98 (D.N.J.1980). Appellants did, however *propose* special questions that were phrased differently from those ultimately used by the trial court: these would have asked the jury if it found the Banks *liable* in negligence. Appellants' Brief at 30 n.24. However, as long as the instructions provided by the trial judge state the applicable law correctly, the form of the language used

can be left to the trial court's discretion. *See Miller v. Poretsky*, 193 U.S.App.D.C. 395, 403, 595 F.2d 780, 788 (1978).

5. The written interrogatory asked:
(1) Do you find by a preponderance of the evidence that any of the defendants committed negligent acts against Columbia Plaza Corporation in connection with the Columbia Plaza construction loan which were the proximate cause of damage to Columbia Plaza

oral charge on vicarious liability, presumably because the written interrogatory on the negligence question was designed to accommodate all of the many defendants against whom negligence was claimed including those defendants not being charged with vicarious liability.[6] As the court explained to the jury, the purpose of the special question form was to "make [its] task easier." 17A Tr. 166. For the special question form to contain everything that the court explained in the oral instructions would have rendered it an extremely unwieldy and burdensome document inasmuch as the oral instructions occupied some 39 transcript pages as reported.[7] 17A Tr. 139–66. Were there no means by which the jury could have considered the Banks' liability under the vicarious negligence theory, then the interrogatory would have been erroneous.

Here, however, the written instruction, coupled with the oral charges on the vicarious liability theory, allowed the jury to fully evaluate the question of the Banks' vicarious liability as well as their direct liability. The first oral charge instructed the jury that "A corporation can act only through its officers, employees or other agents. Thus, any negligent act or omission of an officer . . . in the performance of his duties is held in law to be the negligence of the corporation." 17A Tr. 157. As such, the jury was instructed that in certain circumstances, the act of a corporate officer is the act of the corporation. In the third oral charge, the jury was told that should it find that any negligent acts on Zneimer's part were for his own purposes adverse to those of the Banks, it could not "attribute Mr. Zneimer's negligent acts to the Banks." It could not be more clear that the court had instructed the jury essentially that acts committed by Zneimer in the scope of his employment would be acts committed by the Banks.[8] Accordingly, the language of the written interrogatory asking the jury whether the defendants "committed negligent acts" against CPC did not foreclose the jury from considering whether Zneimer's negligent acts could be imputed to the Banks.[9] We find no error in the submission of the written interrogatory in question.

Appellants argue in the alternative that assuming the question of the Banks' vicari-

Corporation? In order to so find, you must find each of the following essential elements by a preponderance of the evidence.
(a) A defendant owed a duty of ordinary care to the plaintiff and did some act which a person of reasonable prudence would not have done, or failed to do that which a person of reasonable prudence would have done under the circumstances of the situation;
(b) that such action or inaction was the proximate cause of damage to Columbia Plaza Corporation.
J.A. 221–22. The interrogatory further instructed the jury, to indicate which of eight defendant groups listed therein (The Banks; Louis Pomponio Jr.; Paul Pomponio; Peter Pomponio; NRCC; NCC; Piluso; Zneimer) it found to have committed negligent acts which caused CPC damage.

6. *Id.*

7. Moreover, to provide a separate written question setting out the vicarious liability theory might well have prompted an objection by counsel for Zneimer that such would be prejudicial to that defendant. *See* 17A Tr. 174, where counsel for Zneimer objected to the third oral charge on vicarious liability of the three set forth in the text herein, *supra*, be-

cause it focused attention on Zneimer in connection with references to negligence.

8. Indeed, at trial, counsel for appellants sought to characterize Zneimer's actions as acts of the Banks, stating:
Mr. Zneimer—he was the Bank. . . . He was the Bank to Columbia Plaza Corporation and to John McShain, Inc. and to Mr. McShain. Appellants' Brief at 40 n.35, *quoting* 16 Tr. 89.

9. In light of our conclusion that the jury was properly instructed and did have the opportunity to consider the vicarious liability theory, appellants' argument under Rule 49(a) of the Federal Rules of Civil Procedure (regarding the correctness of findings imputed to the court when issues are omitted from special interrogatories) must fail. Since the issue of vicarious liability was not withheld from the jury, no findings on the issue needed to be made by or imputed to the court.
Appellants "apparent agency" theory (*i.e.*, that the Banks were vicariously liable for acts Zneimer committed within the scope of the appearance of authority the Banks allegedly permitted him to attain), while appearing in their brief on appeal, was not raised in the District Court. Consequently it shall not be considered here.

ous liability for negligence was properly submitted to the jury, the jury's findings of negligence on Zneimer's part and of no negligence on the part of the Banks were "necessarily irreconcilably inconsistent" and unsupported by the evidence. Appellants assert that a new trial is required to correct this alleged error.

The jury's findings were not of necessity inconsistent if it determined that Zneimer's negligent acts were committed outside the scope of his employment. Our inquiry, then, is whether the jury was properly instructed as to the law relevant to the scope of employment issue and, if so, whether the jury had before it the requisite amount of evidence that would allow its findings to stand.

■ The court presented to the jury its instruction as to the "scope of employment" element within the third of the three oral instructions on vicarious liability, set forth above.[10] The jury was instructed that any negligence on Zneimer's part could not be attributed to the Banks if, *inter alia*, "the acts of negligence were done solely for Mr. Zneimer's own purposes and not for the Banks' purposes . . . ." 17A Tr. 159. This statement is consistent with that of the Restatement (Second) of Agency, the test followed by this Court, which explains that an employee's conduct is within the scope of employment if, but only if, among other things, "it is actuated, at least in part, by a purpose to serve the master." Restatement (Second) of Agency § 228(1)(c) (1958); *M.J. Uline Co. v. Cashdan*, 84 U.S.App.D.C. 58, 59, 171 F.2d 132, 133 (1948). The instruction also directed the jury that Zneimer's negligence could not be imputed to the Banks if Zneimer's acts "were done solely in furtherance of interests of Mr. Zneimer adverse to the Banks and that the Banks retained no benefits from Mr. Zneimer's actions . . . ." 17A Tr. 158. This likewise embraces the "purpose to serve the master" requirement of section 228(1)(c) of the Restatement and *M. J. Uline Co. v. Cashdan*.

■ There being no infirmity as to the jury's instruction relevant to scope of employment, appellants are left to argue that the finding of the jury lacked the requisite evidentiary support. Appellants orally moved below for judgment notwithstanding the verdict with regard to the vicarious liability issue, which motion was denied without prejudice to the filing of a written motion. Appellants thereafter filed a written motion for judgment *n.o.v.* or for a new trial, which was denied by the trial court on June 1, 1978. J.A. 250, 252–53. Appellants assert now that the court improperly denied their motion for a new trial by treating it as a motion for judgment *n.o.v.*, arguing that the court did not follow the proper standard for denial of the motion when it concluded:

[S]ince this issue clearly presented a jury question, the court will refuse to grant a new trial on this point.

J.A. 253. Appellants' motion argued that the jury's verdict, to the extent that it refused to charge both Zneimer and the Banks with negligence, was against the weight of the evidence. However, the standard of review of a motion for a new trial in such circumstance is not the sufficiency of the evidence, but whether there was a total absence of evidence to support the jury's verdict. *Hadra v. Herman Blum Consulting Engineers*, 632 F.2d 1242, 1244–45 (5th Cir. 1980), *cert. denied*, 451 U.S. 912, 101 S.Ct. 1983, 68 L.Ed.2d 301 (1981), *Coughlin v. Capitol Cement Co.*, 571 F.2d 290, 298 (5th Cir. 1978); *Harris v. Zurich Insurance Co.*, 527 F.2d 528, 530 n.1 (8th Cir. 1975). *See* 6A Moore's Federal Practice ¶ 59.08[5], at 59–154 to 59–156 (1979).

■ Under this test, the trial court acted properly in denying the motion. The jury had before it evidence that Zneimer's negligent acts followed his own purposes and purposes adverse to the Banks'. Zneimer received $320,000 from the Pomponios. Pretrial Stipulation 39, J.A. 156–57.

---

**10.** As noted above, at trial counsel for appellants approved of this oral charge. The Banks, however, objected to it. 15 Tr. 100.

Zneimer admitted at trial that receiving these payments may have influenced him to be negligent in the administration of the loan by making overadvances thereupon. 9 Tr. 70–72. Indeed, by stating that the issue "clearly presented a jury question," the trial court was necessarily concluding that there was not a total absence of evidence upon which the jury could have made the findings that it did. As such, a new trial was clearly unwarranted.

## II. THE TRIAL COURT'S INSTRUCTIONS ON FRAUD

Appellants argue here that the court did not properly instruct the jury on their fraud claim in that while the court gave an oral charge to the jury that "[a]ctionable fraud may result from the concealment of material facts," 17A Tr. 148, the written instruction on the special verdict form only referred to fraudulent misrepresentation. Since concealment was not presented on the written interrogatory, appellants argue, the theory was not emphasized sufficiently to cause the jury to afford it due consideration.

■ We do not find this to constitute reversible error. The concealment instruction was given, although orally. As such, *Ajax Hardware Manufacturing Corp. v. Industrial Plants Corp.*, 569 F.2d 181 (2d Cir. 1977), a case relied upon by appellants, where two of that plaintiff's three theories were omitted from *both* the oral charge and the written interrogatories, is not applicable. Moreover, " ... it is not error to refuse to submit a question or instruction where the issue is adequately covered by other questions or instructions." *Perzinski v. Chevron Chemical Co.*, 503 F.2d 654, 660 (7th Cir. 1974). "The district court has wide latitude in deciding which issues should be covered by special interrogatories. Its action will only be overturned for an abuse of discretion." *Healey v. Catalyst Recovery of Pennsylvania, Inc.*, 616 F.2d 641, 648 (3d Cir. 1980). In *Healey*, the Third Circuit found that the trial court's decision to leave its instruction on causation to the oral charge rather than include it in

the written interrogatory was not an abuse of discretion. 616 F.2d at 648–49. Recalling our earlier acknowledgment of a trial court's function to compact lengthy oral instructions into comprehensible written interrogatories containing the essence thereof, we note that a written instruction that detailed both the concealment and affirmative misrepresentation theories might well have been fraught with superfluity. As appellants themselves state in their reply brief,

There is no bright line dividing fraud by affirmative misrepresentation from fraud by concealment: "where failure to disclose a material fact is calculated to induce a false belief, the distinction between concealment and misrepresentation is tenuous. Both are fraudulent."

Appellants' Reply Brief at 17 n. 15, *quoting* 37 Am.Jur.2d, *Fraud and Deceit* § 144, at 197. The jury was well apprised of appellants' fraud theories. There is no error here.

## III. EVIDENTIARY RULINGS INVOLVING PRIOR INDICTMENTS AND CONVICTIONS OF TWO INDIVIDUAL DEFENDANTS

Louis Pomponio, Jr. and Piluso were indicted in 1973 for violating and conspiring to violate the Travel Act, 18 U.S.C. § 1952. Zneimer was named as an unindicted coconspirator. Pomponio and Piluso were convicted in another court of conspiracy and two substantive counts. In the case here, the trial court admitted the conviction of Piluso for impeachment purposes, but excluded Pomponio's conviction and the indictments of both. As the following discussion will reflect, the court's rulings on these evidentiary issues were not erroneous.

### A. Exclusion of the Indictments and Conviction

■ The indictment presented to the court below charged that a conspiracy had taken place from 1967 to 1972 and referred to 85 overt acts. J.A. 174–94. A finding that any of the overt acts took place would have sustained a verdict of conspiracy. Un-

der Rule 803(22) of the Federal Rules of Evidence, judgments of prior convictions are admissible "to prove any fact essential to sustain the judgment." Since general verdicts were rendered in the criminal cases, however, these verdicts did not themselves provide a basis for concluding that the alleged overt acts involving Columbia Plaza—which were among a great number of alleged overt acts not involving the project—were proved in those cases.

As such, the trial court applied the test of *Emich Motors Corp. v. General Motors Corp.*, 340 U.S. 558, 71 S.Ct. 408, 95 L.Ed. 534 (1951) to determine whether and how the matters relating to Columbia Plaza were adjudicated in the criminal cases. The court explored these questions with appellants' counsel, 10 Tr. 47–54, and concluded, pursuant to *Emich*, that it was not possible to determine for what reasons or upon what overt acts the jury in the criminal cases convicted the defendants. 10 Tr. 54.[11] The requirements of Rule 803(22) not being met, the trial court properly excluded the evidence.

B. *Rulings Regarding Impeachment of Piluso's Testimony*

█ The court permitted Piluso to be impeached with evidence of his conviction of conspiracy and substantive violation. 10 Tr. 69, 77–80. In doing so, the court applied the rule that such impeachment "must be limited to whether the defendant had previously been convicted of a felony, to what that felony was and to when the conviction was obtained," *United States v. Dow*, 457 F.2d 246, 250 (7th Cir. 1972), and that impeachment could not transcend "the essential facts of the convictions," *United States v. Mitchell*, 427 F.2d 644, 647 (3d Cir. 1970). Believing that references to Zneimer and to bribery in connection with Piluso's

conviction would be prejudicial by unfairly positing that Zneimer had been bribed in connection with the Columbia Plaza project, the court below properly ordered such references omitted. 10 Tr. 68.

Appellants argue, however, that the references to Zneimer and to bribery could and should have been admitted under *Walder v. United States*, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954) to rebut sweeping claims of innocence going beyond a mere denial of the allegations. However, *Walder* involved sweeping denials made affirmatively upon direct examination, and Piluso's denials were induced by appellants' cross-examination. Consequently, the trial court's refusal to admit the references to Zneimer and to bribery did not offend the *Walder* rule.[12]

IV. THE BANKS' COUNTERCLAIMS

Appellants assert that for the same reasons they believe a new trial is necessary on the issue of negligence and on the claim based upon an alleged fraudulent conspiracy, a new trial is required on the Banks' counterclaims as well. They state that trial errors concerning the Banks' liability for Zneimer's negligence and the rulings regarding the admissibility of evidence of the conspiracy infected appellants' defense to the counterclaims just as they did the affirmative case. Since we have found no reversible error as to these matters regarding the affirmative case, there likewise is no basis for a new trial on the counterclaims.

V. THE AWARD OF ATTORNEY'S FEES

After the trial on liability took place, a separate trial on damages was held, following which the trial court, over appellants' objection, directed a verdict on damages for the Banks. The Banks were awarded $187,-

---

11. "The general verdict is as inscrutable and essentially mysterious as the judgment which issued from the ancient oracle of Delphi." *Skidmore v. Baltimore & O. R. Co.*, 167 F.2d 54, 60 (2d Cir.) (Frank, J.), *cert. denied*, 335 U.S. 816, 69 S.Ct. 34, 93 L.Ed. 371 (1948).

12. *See United States v. James*, 181 U.S.App. D.C. 55, 60, 555 F.2d 992, 997 (1977): "Ordinarily evidence inadmissible to prove the case-in-chief is rendered admissible only if 'the defendant himself introduces the evidence or is in some manner estopped from objecting to its use,' " *quoting Walder v. United States*, 347 U.S. at 65, 74 S.Ct. at 356.

265.38 for attorney's fees, in accordance with language in the promissory notes underlying the foreclosure deficiency and the three notes executed by JMI in 1972 providing for attorney's fees of 10 and 15 percent, respectively. Appellants contend that the court erred in not inquiring into the reasonableness of the attorney's fees.

In *United States v. Reed,* 31 A.2d 673 (D.C.App.1942), the Municipal Court of Appeals held that while stipulations in promissory notes for the payment of attorney's fees are valid, "[s]uch provisions, however, are sustained only as an indemnity for the reasonable fees necessarily and properly paid or incurred." 31 A.2d at 675. The court in *Reed* concluded that a reasonable fee is to be determined upon consideration of the circumstances of each case, and that should the court or a party so desire, testimony as to the nature of the services rendered and the reasonable value thereof may be taken. *Id.* at 675–76.

In the instant case, with respect to the notes on the foreclosure deficiency, there was a pretrial stipulation by which the parties agreed that after the foreclosure sale there was a claimed deficiency of $415,-480.74, "plus interest of 11% and attorney fees under the terms of the note." Pretrial Stipulation 52, J.A. 160. The trial court ruled that once the appellants' defense to the notes on fraud grounds failed, the amount of the deficiency and the application of the 10 percent attorney's fees to the amount due was conceded. 24 Tr. 82–84. As such the court did not "preclude appellants from challenging the reasonableness of the attorney's fees" on these notes, as they assert in their brief. Appellants' Brief at 81. Furthermore, with respect to the 15 percent provision in the three 1972 notes, before the Banks presented the court with their computations as to the amount of interest and attorney's fees thereupon, the court asked appellants whether they believed there was an issue to present to the jury. 24 Tr. 85. Appellants did not then challenge the reasonableness of the attorney's fees provisions. The only point at which appellants assert that they objected

to the attorney's fees in the District Court was where appellants' counsel noted that "the claim for the foreclosure deficiency 'includes a lot of attorneys' fees, but I don't think there has been any proof offered of that at all.'" Appellants' Reply Brief at 23 n. 22, *quoting* 24 Tr. 76. It is clear that had appellants a meritorious argument challenging the amount of attorney's fees awarded they never raised it at trial.

Appellants assert, however, that even if they did not challenge the reasonableness of the attorney's fees provisions, the trial court had an independent and special responsibility to inquire whether the fees to be awarded were excessive. Appellants cite *Pete v. United Mine Workers of America Welfare and Retirement Fund,* 171 U.S. App.D.C. 1, 16–17, 517 F.2d 1275, 1291–92 (1975) (en banc) in support of their argument. But that case did not involve a stipulated attorney's fee provision in a debt instrument as we have before us. Instead, it concerned a trial court's award of attorney's fees, pursuant to its equitable discretion, for the efforts of counsel in litigating that case. The attorney's fee provisions in the various instruments in this case were determined not by a trial court's exercise of equitable powers, but through the arms'-length bargaining between the parties that resulted in their contract. Appellants cannot seriously argue that the court had an independent duty to examine whether they had entered into a favorable bargain. The trial court properly awarded the attorney's fees to the Banks pursuant to the agreed-upon provisions.

## VI. THE POMPONIOS' CROSS–APPEAL

At trial Peter Pomponio, a non-lawyer, was permitted to represent not only himself but the other Pomponio individuals and the two Pomponio-controlled companies. Peter Pomponio has filed a cross-appeal brief on behalf of these Pomponio defendants save NCC, against whom judgment was not en-

tered below, and Judith Pomponio.[13] Cross-appellants seek a new trial, essentially on the ground that they were not permitted to present their case adequately. They cite not one shred of legal authority—neither case, nor statute, nor rule of procedure, nor other statement of law—in support of their arguments. As such, cross-appellants' points may be addressed rapidly and without profound exploration thereupon.

Cross-appellants first argue that they were prejudiced by the "harsh sanctions" imposed upon Peter Pomponio at trial, in his representation of them. Peter Pomponio was at one time represented by counsel in the case below, who withdrew from representation during the pretrial stage. Although Pomponio never obtained new counsel, he nowhere suggested, at trial level or here, that he or the Pomponios could not afford to retain counsel. At trial Pomponio was not allowed to make an opening statement. However, the colloquy between him and the trial court as the case began demonstrated why he was properly denied permission to make on opening statement: he concededly failed to comply with the court's pretrial order, which stated that parties who did not so comply would not be permitted to present evidence. 2 Tr. 46–51. Moreover, Pomponio was subject to another order of the court precluding him from presenting evidence because of his refusal to answer questions at a deposition. 2 Tr. 50–51. Nonetheless, Pomponio was given ample opportunity to participate in the examination of witnesses at trial, and made substantial use thereof. Any sanctions imposed against Pomponio regarding the introduction of evidence because of his failure to file a pretrial brief were completely justified. This assertion of error is meritless.

Second, cross-appellants argue that their defense was prejudiced by the court's dismissal of the counterclaim of NRCC and NCC. Other than a conclusory statement of two sentences occupying five lines in their brief, cross-appellants make no attempt to support this point. It is rejected.

Third, cross-appellants attempt to relitigate the facts that were adduced at trial in their conclusory argument that the evidence did not support the allegation of JMI and CPC that funds were diverted. This argument is unpersuasive.

Fourth, cross-appellants challenge the jury finding that JMI and CPC were third-party beneficiaries of the loan guaranties executed by the Pomponios by a bald, unsupported assertion that the guaranties "ended with the foreclosure" and did not contemplate costs thereafter. This argument is also without merit, as is cross-appellants' argument that the contributory negligence of CPC and JMI found by the jury relieved the Pomponios of their obligation under the guaranties.

Fifth, cross-appellants aver that the trial court erred by denying Pomponio the right to argue the testimony of Paul Fry. Another two-sentence statement, barren of facts, is presented in support of this point, to the simple effect that Fry's testimony established that JMI could have mitigated its damages somehow. How this constituted error is neither explained nor discerned from the record. No error is found here.

Last, cross-appellants argue that Paul Pomponio was denied the right to represent himself at trial, even though he was represented by Peter Pomponio. How this prejudiced Paul Pomponio is not even suggested.

The cross-appeal, therefore, is denied.

## CONCLUSION

Our review of the extensive record and arguments in this case compels the conclusion that the findings of the jury were amply supported by the evidence presented at trial, that the rulings and orders of the District Court were without error, and that the entry of judgment by the court was proper. Accordingly, the judgment of the District Court is

*Affirmed.*

13. *See* note 2, *supra.*